# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**RANDY HAINLEN**
Kokomo, Indiana

**JEFFERY W. ELFTMAN**
Kokomo, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
**ERIC BABBS**
Deputies Attorney General
Indianapolis, Indiana

**FILED**

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JERRY VANZYLL | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 34A02-1111-CR-1050 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HOWARD SUPERIOR COURT
The Honorable William C. Menges
Cause No. 34D01-1008-FB-722

**December 4, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Jerry Vanzyll ("Vanzyll") was convicted in Howard Superior Court of Class B felony dealing in methamphetamine, Class D felony possession of methamphetamine, Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance, and Class A misdemeanor resisting law enforcement. Vanzyll appeals his convictions and raises the following three issues:

I. Whether the trial court abused its discretion by allowing a Howard County Jail Guard to testify that Vanzyll admitted to writing a letter that was found at the jail, which was admitted as an exhibit at trial;

II. Whether the evidence was sufficient to prove that Vanzyll resisted law enforcement; and,

III. Whether the evidence was sufficient to prove that Vanzyll manufactured methamphetamine.

We affirm in part, remand in part, and reverse for proceedings consistent with opinion.

**Facts and Procedural History**

On August 24, 2010, the Howard County Drug Task Force and the Kokomo Police Department SWAT Team were conducting surveillance of a residence in Kokomo, Indiana because the police department had received information that Vanzyll and another individual residing at the residence were manufacturing and selling methamphetamine. During their surveillance, the officers obtained sufficient information to believe that they could apply for and obtain a search warrant of the residence.

To secure the residence prior to obtaining the warrant, officers approached the front and back doors of the home. Officer Brad Reed was wearing a police raid vest and badge. He knocked loudly on the front door and yelled "Kokomo Police Department."

Tr. p. 30. No one responded at the front door, but Officer Reed heard one of the detectives at the back door yelling, so the officer ran to the rear of the residence. He then observed:

> Detective Nielson and Captain Salinas giving orders to a subject through, I believe it would have been a kitchen window, to come outside. I approached the door and then I observed Mr. Vanzyll abruptly open the door. It appeared to me as though he was going to attempt to flee the rear of the residence and run through us. He kind of got out the door, had a startled look on his face and abruptly turned and tried to slam the door shut and go back in the house.

Tr. p. 31.

When Vanzyll attempted to slam the door while running back into the residence, it did not shut all the way, so Officer Reed drew his weapon and pushed the door open with his foot. He then "loudly announced police and ordered [Vanzyll] to come to the back door." Tr. p. 32.

Captain Salinas, who was stationed at the back door of the residence, heard Officer Reed knock on the front door and identify himself as a police officer. He then saw Vanzyll look through a window near the back door. Captain Salinas testified:

> [W]hen he did that I positioned myself from where I was towards where he could see me and I was wearing a ballistic gray vest with the police insignia on my right side. I also had my badge that I use when I wear that vest and I lifted it up to show him that it was police and waived [sic] at him and tried to talk to him, I don't know if he could hear me or not, to come out.

Tr. p. 57.

While Officer Reed was knocking on the front door of the residence, Detective Nielson, who was also standing at the back door of the residence, could hear someone running back and forth in the house. After Captain Salinas told the detective that he saw

3

Vanzyll looking out the back window, the detective saw the doorknob of the rear door start to turn.

> A few second[s] later, that door was flung open and . . . Vanzyll stepped out as if he was trying to run past me. As soon as he saw me, he ran, he closed the door quickly and ran back inside the residence. . . Myself and Captain Salinas were calling for . . . Vanzyll to come back outside after identifying ourselves several times once again.

Tr. pp. 64-65.

Vanzyll did not initially comply with Officer Reed's order to return to the back door, but a woman approached the back door. The woman refused to leave the house and get on the ground, and therefore, she was forced to the ground by the officers and detained. Vanzyll then returned to the back door holding his hands up but refused commands to exit the residence and "get on the ground." Tr. p. 36. The officers then forced him on the ground, handcuffed him, and searched him for weapons.

Police officers then entered the residence to make sure that no one else was inside. As they did so, they smelled the overwhelming odor of ammonia, which is associated with the manufacture of methamphetamine. The officers also observed what appeared to be a "one-pot" methamphetamine lab in Vanzyll's bedroom.

After securing and exiting the residence, the officers applied for and obtained a search warrant. While searching the residence, they found liquid that tested positive for the presence of methamphetamine, a fuel can that tested positive for ammonia, a bottle which tested positive for hydrochloric acid gas, containers with white solid crystals, lye, and drain opener. In Vanzyll's bedroom, the officers found identification, cash, a Ziploc bag with white residue, which tested positive for the presence of methamphetamine,

4

digital scales, and a glass methamphetamine pipe. The officers also found remnants of a methamphetamine lab in a trash bag in the basement of the residence.

Vanzyll was charged with Class B felony dealing in methamphetamine, Class D felony possession of methamphetamine, Class D felony possession of chemical reagents or precursors with intent to manufacture a controlled substance, and Class A misdemeanor resisting law enforcement. He was also incarcerated in the Howard County jail while awaiting trial. During his incarceration, he wrote a letter to his co-defendant, asking her to tell the police that they slept in the living room of the residence where everyone smokes. The letter was intercepted, and a jail guard asked Vanzyll whether he wrote the letter. The letter and Vanzyll's statement that he wrote it were admitted at trial over Vanzyll's objection.

A jury trial began on September 9, 2011, and Vanzyll was found guilty as charged. Vanzyll was ordered to serve a total sentence of eighteen years with six years suspended to probation for the four convictions. Vanzyll now appeals.[1]

### I. Admission of the Jail Guard's Testimony

The admission of evidence is within the sound discretion of the trial court, and we review the court's decision only for an abuse of that discretion. Boatner v. State, 934 N.E.2d 184, 186 (Ind. Ct. App. 2010). The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

[1] Oral argument was held in this appeal on October 31, 2012 in the Fine Arts Center at the Seeger Junior/Senior High School in West Lebanon, Indiana. We express our deep gratitude to the students, faculty, and staff at the school and to the local bench and bar for their outstanding hospitality.

Vanzyll argues that his statements to the jail guard admitting that he wrote the letter should not have been admitted at trial because he was not afforded the protections of *Miranda*. In response, the State contends that *Miranda* does not apply because Vanzyll was not questioned by the jail guard about a criminal matter; rather, he was questioned about breaking the administrative rules of the jail.

Custody, as that term is applied under *Miranda*, is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." Howes v. Fields, 132 S.Ct. 1181, 1189 (2012). And the Supreme Court has "repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial" even when the "prisoner is removed from the general prison population and questioned about events that occurred *outside* the prison." Id. at 1187 (emphasis added).

In Howes, inmate Fields, who was serving a sentence in a Michigan jail, was escorted to a conference room by two armed sheriff's deputies and questioned concerning allegations that he engaged in sexual conduct with a twelve-year-old boy before he was incarcerated. Fields was not restrained during the interview and was told he could leave whenever he wanted. The door to the conference room was sometimes open and sometimes shut during the interview that lasted between five and seven hours. When Fields became agitated halfway through the interview, he was told to sit down but that if he did not want to cooperate he could leave. Although Fields stated on several occasions that he no longer wanted to talk to the deputies, they continued to question him and he eventually confessed. When the interview was finally over, Fields had to wait approximately twenty minutes for a corrections officer to escort him back to his jail cell.

6

As a result of this interrogation, Fields was charged with criminal sexual conduct and prior to trial moved to suppress his confession pursuant to *Miranda*. His motion was denied and his renewed objection at trial was overruled. After he unsuccessfully challenged his conviction on direct appeal, he filed a petition for writ of habeas corpus in federal district court. The district court and Sixth Circuit Court of Appeals concluded that his confession should have been suppressed, but the United States Supreme Court disagreed. The court held that Fields "was not in custody within the meaning of Miranda" because he was told he could end the interview and return to his cell, he was not physically restrained or threatened, and was questioned in a well-lit conference room where the door was sometimes left open. Id. at 1193-94.

In this case, Corrections Officer Gregory Burns testified that he confiscated a letter that Vanzyll wrote to his girlfriend, who was also an inmate at the Howard County Jail, which violated the jail's rules. After finding and reading the letter taped to the bottom of a desk in a classroom, Officer Burns proceeded to Vanzyll's jail cell and questioned Vanzyll about the letter. Vanzyll was not free to leave his cell or the officer's presence during the questioning, but the questioning appears to have been brief in duration. In response to Officer Burns's questions, Vanzyll admitted that he wrote the letter and that his girlfriend was an inmate at the jail as well. Tr. p. 324. The letter contains incriminating statements. But Officer Burns did not question Vanyll about those statements. He limited his questioning to whether Vanzyll wrote the letter and whether it was intended for a female inmate.

Officer Burns's interview of Vanzyll was far shorter and much less formal than the interrogation upheld in <u>Howes</u>. Although Vanzyll was not free to leave his cell, he was neither threatened nor physically restrained during Burns's questioning. There is nothing in the record that would lead us to conclude that Vanzyll was made to feel uncomfortable or coerced during the brief interview; it was a simple inquiry as to whether he wrote the letter and for whom it was intended. Under these facts and circumstances, Vanzyll was not in custody for the purposes of *Miranda,* and the admission of Officer Burns's testimony concerning Vanzyll's statements about the letter was not an abuse of discretion. Moreover, we observe that Vanzyll does not appeal the actual admission of the letter itself, and it is noteworthy that Vanzyll has written his full name and what appears to be his social security number in the letter, both apparently to identify himself to his girlfriend for the purposes of her future visitation of him in jail.

## II. Sufficient Evidence

When we consider a challenge to the sufficiency of evidence to support a conviction, we neither reweigh the evidence nor judge the credibility of the witnesses; instead, we respect the exclusive province of the trier of fact to weigh any conflicting evidence. <u>McHenry v. State</u>, 820 N.E.2d 124, 126 (Ind. 2005). We consider only the probative evidence and reasonable inferences supporting the verdict, and we will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. <u>Id.</u>

A. *Resisting Law Enforcement*

Vanzyll was charged and convicted of Class A misdemeanor resisting law enforcement. Specifically, the charging information provides: Vanzyll "did knowingly flee from Brad Reed, a law enforcement officer, after said officer identified himself by visible or audible means and visibly or audibly ordered said defendant to stop[.]" Appellant's App. p. 14; see also Ind. Code § 35-44.1-3-1(a)(3) (2012).[2]

> A police officer's order to stop need not be limited to an audible order to stop. The order to stop may be given through visual indicators. Evidence of a proper visual order to stop is based on the circumstances surrounding the incident and whether a reasonable person would have know that he or she had been ordered to stop.

Fowler v. State, 878 N.E.2d 889, 895 (Ind. Ct. App. 2008) (citing Spears v. State, 412 N.E.2d 81, 83 (Ind. Ct. App. 1980)).

Vanzyll argues that the evidence is insufficient to support his conviction because he had no obligation to answer the door when the officers knocked, and he was not ordered to stop when he was standing at the rear door of the residence. From the evidence admitted at trial, a reasonable jury could conclude that Vanzyll was aware that police officers were stationed at the front and back doors of the residence, and that those officers wanted him to exit the residence. But there is no evidence from which a reasonable fact-finder could conclude that the officers ever ordered Vanzyll to stop at any point before or after he had opened the back door and then ran back into the residence.

Vanzyll accurately observes that he "had no obligation to comply with officer's [sic] requests that he answer the door." Appellant's Br. at 11 (citing Hardister v. State,

---

[2] Effective July 1, 2012, Title 35 Article 44 was repealed and replaced with Title 35 Article 44.1. Subsection 1(a)(3) of the resisting law enforcement statute was not changed under Article 44.1.

9

849 N.E.2d 563 (Ind. 2006)). And the State concedes that Vanzyll was not required to open the door to the officers when they knocked,[3] but argues that he committed resisting law enforcement when he ran back inside the house. Specifically, the State argues that:

> Defendant was aware that the officers were outside and that they wanted him to come outside. Yet, when he finally opened the door, Defendant ran back inside the house, fleeing from the officers. That at that specific moment no officer ordered him to stop is irrelevant because before and after he returned inside the house, the officers did order him to go to the back door.

Appellee's Br. at 14.

The State unconvincingly attempts to analogize the facts of this case to those in Wellman v. State, 703 N.E.2d 1061 (Ind. Ct. App. 1998). In that case, Wellman stepped outside his residence to talk to officers who were investigating a report of child abuse. Wellman spoke to the officers for several minutes but was generally uncooperative. Wellman then told the officers that he was going back inside his residence, at which point the officer told him not do to so. Wellman disobeyed the order, went inside the house and locked the door behind him.

Wellman was convicted of resisting law enforcement for entering his house despite the officer's command to remain outside. Our court affirmed his conviction on

---

[3] In Hardister v. State, 849 N.E.2d 563, 570 (Ind. 2006), our supreme court observed, "[i]n response to a 'knock and talk' residents have the right to deny officers admission and to refuse to answer questions. . . . If residents exercise this right, officers generally must leave and secure a warrant if they want to pursue the matter."

In that case, our supreme court also observed that flight in response to a knock on the door is not the functional equivalent of denying officers admittance. Unprovoked flight "adds to the information available to the officers. 'It is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such' and warrants further investigation by police." Id. (citations omitted). But it does not create an exigent circumstance that justifies warrantless entry and pursuit of fleeing residents through a house. Id. at 571.

appeal after concluding that Wellman fled from law enforcement by disobeying the officer's command to remain outside.

Conversely, in this case, Vanzyll did not leave his residence, and he had no obligation to do so when Officer Reed knocked on the front door. Vanzyll was never given a command to stop. Vanzyll was not given any command by Officer Reed until after he shut the back door and returned to the interior of the residence. After Vanzyll returned to the interior of the residence, Officer Reed ordered him to return to the back door and exit the residence. Although Vanzyll did not immediately comply with Officer Reed's order, he did exit peaceably after a short period of time had elapsed.

Under these facts and circumstances we conclude that the State's evidence was not sufficient to prove that Vanzyll fled from Officer Reed. We therefore reverse his resisting law enforcement conviction and remand this case to the trial court with instructions to vacate its judgment of conviction and sentence on that count.

B. *Manufacture of Methamphetamine*

Vanzyll was charged and convicted of Class B felony dealing in methamphetamine. Specifically, the charging information provides: "Vanzyll did knowingly manufacture methamphetamine[.]" Appellant's App. p. 11. See also Ind. Code § 35-48-4-1.1(a) (2008) ("A person who . . . knowingly or intentionally . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony[.]"). The term "manufacture" is defined in Indiana Code section 35-48-1-18 as:

(1) the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container. It does not include the preparation, compounding, packaging, or labeling of a controlled substance:

  (A) by a practitioner as an incident to his administering or dispensing of a controlled substance in the course of his professional practice; or

  (B) by a practitioner, or by his authorized agent under his supervision, for the purpose of, or as an incident to, research, teaching, or chemical analysis and not for sale; or

(2) the organizing or supervising of an activity described in subdivision (1).

Vanzyll concedes that there was sufficient evidence to prove that all the necessary components for manufacturing methamphetamine were found in the residence, but argues that the State failed to prove that there was an active methamphetamine lab in the residence. The State argues that it proved that there was an active methamphetamine lab at the residence, but also relying on the definition of manufacture quoted above, the State contends that the term manufacture "does not require that the meth lab be active." Appellee's Br. at 17.

Vanzyll extrapolates facts from three cases in support of his assertion that the State must present evidence of an active methamphetamine lab to prove that he manufactured methamphetamine. Vanzyll cites to Bush v. State, 772 N.E.2d 1020, 1023 (Ind. Ct. App. 2002), trans. denied, which is often cited for its holding that a conviction for manufacturing of a controlled substance does not require that manufacturing be completed or that there be actual product. He also relies on Robertson v. State, 877 N.E.2d 507 (Ind. Ct. App. 2007), in which we affirmed the dealing in methamphetamine

12

conviction in part because two law enforcement officers testified that the several items used in the manufacture of methamphetamine found in Robertson's house led them to conclude that Robertson was "actively manufacturing methamphetamine using the red phosphorous method." Id. at 516. Finally, Vanzyll directs our attention to Traylor v. State, 817 N.E.2d 611 (Ind. Ct. App. 2004), trans. denied, in which we concluded that the evidence was sufficient to support Traylor's conviction for manufacturing methamphetamine where police officers found items commonly used in the manufacture of methamphetamine, and a State police officer testified that the "reaction vessel that was found during the search was a 'batch of meth cooking right there.'" Id. at 620 (record citation omitted). But Vanzyll has not cited to any case explicitly requiring evidence of an active methamphetamine lab to prove manufacturing as that term is defined in Indiana Code section 35-38-1-18.

At trial, Officer Reed testified that "immediately upon entering the residence we were struck with an overwhelming strong odor of ammonia or odor I would associate with the manufacturing of methamphetamine, through my experience." Tr. p. 41. During the protective sweep of the residence, Detective Nielson observed pseudoephedrine blister packs and what he believed to be a one-pot methamphetamine lab in a plastic bucket. Officer Melton also believed there was a methamphetamine lab inside the house after he observed a can of Coleman fuel, blister packs, and two-liter bottles with a substance it them. He testified that "there was the smell of chemicals in the house, you could smell it. There's no other smell like it when you deal with a meth lab, all meth labs

pretty much smell the same. There's just no other odor like it. It's very distinct so that's how I know its usually involved in a meth lab." Tr. p. 81.

Photographs of the methamphetamine lab in the plastic bucket found in Vanzyll's bedroom were admitted at trial, and Officer Melton found ninety-six pseudoephedrine tablets and digital scales in that bedroom. In addition, State Trooper Josh Mallor testified to finding lye and drain opener containing sulfuric acid in the residence, which items are commonly used in the manufacture of methamphetamine. He also took samples of the liquid found in the two liter bottles. Officer Melton explained the process of cooking methamphetamine to the jury, including that after the ingredients are combined, a liquid is produced, which then has to be processed into a powder form. Tr. p. 291. The sample of liquid removed from one of the two-liter bottles indicated the presence of methamphetamine. Tr. p. 300. Finally, the officers also found remnants of a methamphetamine lab in a black trash bag in the basement.

Although no law enforcement officer specifically testified that the methamphetamine lab was active, the evidence in this case was sufficient for the jury to conclude that Vanzyll was in the process of manufacturing methamphetamine, which had not yet been reduced to its final solid form. We therefore affirm Vanzyll's Class B felony dealing in methamphetamine conviction.

**Conclusion**

The trial court did not abuse its discretion when it admitted the jail guard's testimony that Vanzyll admitted to writing the letter that was also admitted at trial as State's Exhibit 8A. The evidence was sufficient to prove that Vanzyll manufactured

14

methamphetamine. However, the State failed to present sufficient evidence that Vanzyll committed Class A misdemeanor resisting law enforcement, and therefore, we reverse that conviction.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

VAIDIK, J., and BARNES, J., concur.