# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**BRUCE W. GRAHAM**
Graham Law Firm, P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianpolis, Indiana

FILED
Sep 23 2014, 9:41 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DALE BULTHUIS III, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1402-CR-49 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Randy J. Williams, Judge
Cause No. 79D01-1308-FB-21

**September 23, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Dale Bulthuis III ("Bulthuis") was convicted following a jury trial in Tippecanoe Superior Court of Class B felony dealing in methamphetamine and two counts of Class C felony neglect of a dependent. The trial court sentenced Bulthuis to an aggregate term of eighteen years. The trial court also ordered restitution in the amount of $9,597 to the victim and $2,443.44 to the State. Bulthuis appeals and presents three issues, which we restate as:

I.   Whether the trial court erred in admitting evidence found during a search of the garage of the home in which Bulthuis was located;

II.  Whether the State presented evidence sufficient to support Bulthuis's conviction for Class B felony dealing in methamphetamine; and

III. Whether the trial court abused its discretion in ordering restitution to the State.

We affirm.

**Facts and Procedural History**

On August 16, 2013, Shane Allen ("Allen"), a case manager for the Department of Child Services ("DCS") was investigating a report of unsupervised children and manufacturing methamphetamine at a home in Tippecanoe County. Allen therefore met with Lieutenant Scott Hodson ("Lt. Hodson") of the Tippecanoe County Sheriff's Department to investigate the report. The two went to the house, parked on the street in front of the residence, and walked up the driveway to the house. When they approached the attached garage, they noticed a chemical odor, but the odor dissipated. Before they could get to the front door of the house, Kristen Wireman ("Wireman") opened the door and stepped outside. Wireman told Allen and Lt. Hodson that she lived at the house along with Bulthuis's children, two-year-old A.B. and four-year-old R.B. Wireman also

2

stated that she rented the house and that she had signed the lease. Allen asked Wireman if they could look inside the house, and Wireman said, "sure" and let them inside. Suppression Hearing Tr. p. 24.

Inside the house, Allen and Lt. Hodson saw the two children and another woman. Allen told Wireman that they were there to investigate a report that a man named "Dale" was manufacturing methamphetamine at the residence. Wireman stated that the defendant, Dale Bulthuis, was the father of the children and that he visited the residence, but that he did not live there and was not there at the time. The older child, however, nodded his head and said, "yes." Suppression Hearing Tr. p. 24. Shortly thereafter, Lt. Hodson asked Wireman again if Bulthuis was there, and Wireman said he was not. But R.B. again nodded his head "yes." Id. Lt. Hodson then asked Wireman if she would mind if he looked in her house for Bulthuis. Wireman responded, "no, I don't mind at all." Id. Lt. Hodson asked R.B. where Bulthuis was. The boy stated that Bulthuis was in the bedroom and led the officer to a bedroom down the hallway, where Lt. Hodson saw a man, later identified as Bulthuis, hiding in a closet. After waiting for another officer to arrive, Lt. Hodson took Bulthuis out of the closet and placed him in a police vehicle. Lt. Hodson then discovered that there was an active warrant for Bulthuis's arrest.

Upon returning to the house, Lt. Hodson asked Wireman if he could look in the garage. Wireman initially responded, "yeah," but then, as Lt. Hodson opened the garage door, Wireman asked why he wanted to look in the garage. Suppression Hearing Tr. p. 26. Lt. Hodson responded by stating that they had received information that someone had been manufacturing methamphetamine at the residence. Wireman then waved her

3

hand and stated, "yeah, go ahead." Tr. p. 26. When Lt. Hodson entered the garage, he noted a strong chemical smell but determined that the odor was coming from a motorcycle that had just been repainted. Lt. Hodson looked in a trash bag lying on the floor of the garage and found battery shavings, which he knew was a byproduct of the manufacture of methamphetamine; he also saw camping fuel and starter fluid, which he also recognized as being used in the manufacture of methamphetamine. Inside a grill, Lt. Hodson found a device set up to generate hydrogen chloride ("HCl"), another item used in the manufacture of methamphetamine. Because of the potential dangers presented by the presence of the suspected methamphetamine lab, Lt. Hodson ordered the occupants of the house to evacuate and contacted the Indiana State Police ("ISP") for assistance to safely remove the materials.

Lt. Hodson spoke with Wireman and again obtained her consent to search the house, this time having her sign a written consent form. Thereafter, Lt. Hodson learned that Wireman too had an active warrant for her arrest, and she was taken to jail. Because Wireman was no longer present and therefore unable to revoke her consent to search, Lt. Hodson decided to obtain a search warrant. After obtaining the search warrant, the police, including ISP Detective Brock Russell ("Det. Russell"), searched the house and garage. Det. Russell found several items associated with the manufacture of methamphetamine: empty boxes of "cold packs," lithium battery shavings, empty bottles of starting fluid, camping fuel, drain cleaner, digital scales, pieces of aluminum foil, coffee filters, and the above-mentioned HCl generator. Also found was a plastic bag with a white residue which later tested positive as methamphetamine. When the police searched the National

4

Precursor Log Exchange ("NPLEX") records, they discovered that both Bulthuis and Wireman had reached the allowed purchase limit of 7.2 grams of pseudoephedrine within thirty days. Indeed, both had recently attempted to purchase pseudoephedrine but been denied due to having reached the allowed limit.

Detective Jacob Amberger ("Det. Amberger") of the Tippecanoe County Sheriff's Department later interviewed Bulthuis. Bulthuis signed a written acknowledgement of his Miranda rights, but still spoke with the detective. During his interview, Bulthuis admitted that he "screwed up" and claimed that he had only "tinkered with" the HCl generating bottle found in the garage. Ex. Vol., State's Ex. 74T, pp. 12, 14. Bulthuis stated that he obtained pseudoephedrine so that he could make "a couple [of] extra bucks." Id. at 12. Bulthuis also told the detective that the bottle found in the garage was the "last one" and that the "girls" were not involved. Id. at 14.

On August 21, 2013, the State charged Bulthuis with dealing in methamphetamine as a Class B felony, two counts of neglect of a dependent as a Class C felony, and maintaining an illegal drug lab as a Class D felony. Thereafter, Bulthuis requested and received permission to proceed *pro se*. On October 28, 2013, Bulthuis filed a *pro se* motion to suppress. The trial court held a suppression hearing on November 5, 2013, and issued an order denying Bulthuis's motion to suppress on November 14, 2013. Per Bulthuis's request, the trial court appointed counsel to represent him at trial. A jury trial was held on November 19–20, 2013, at the conclusion of which the jury found Bulthuis guilty as charged.

5

At a sentencing hearing held on December 20, 2013, the trial court vacated Bulthuis's conviction for maintaining an illegal drug lab. The court then imposed a sentence of twelve years on the Class B felony conviction and six years on the Class C felony convictions. The trial court ordered the sentences on the Class C felony convictions to be served concurrently, but consecutively to the sentence on the Class B felony conviction, for an aggregate sentence of eighteen years. The court ordered Bulthuis to serve ten years executed, two years in Community Corrections, and six years suspended. Bulthuis now appeals.

### I. Admission of Evidence Found During Search

A. *Standard of Review*

When a defendant challenges the constitutionality of a search following a completed trial, the issue is one of whether the trial court properly admitted the evidence. Casady v. State, 934 N.E.2d 1181, 1188 (Ind. Ct. App. 2010), trans. denied. Questions regarding the admission of evidence are entrusted to the sound discretion of the trial court. Fuqua v. State, 984 N.E.2d 709, 713-14 (Ind. Ct. App. 2013), trans. denied. Accordingly, we review the court's decision on appeal only for an abuse of that discretion. Id. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. Id. Regardless of whether the challenge is made through a pretrial motion to suppress or by an objection at trial, our review of rulings on the admissibility of evidence is essentially the same: we do not reweigh the evidence, and we

consider conflicting evidence in a light most favorable to the trial court's ruling, but we also consider any undisputed evidence that is favorable to the defendant. Id.

Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution protect "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures[.]" U.S. Const. Amend. IV; Ind. Const., art. I § 11. These protections against unreasonable governmental searches and seizures are a principal mode of discouraging lawless police conduct. Friend v. State, 858 N.E.2d 646, 650 (Ind. Ct. App. 2006) (citing Jones v. State, 655 N.E.2d 49, 54 (Ind. 1995); Terry v. Ohio, 392 U.S. 1, 12 (1968)). When the police conduct a warrantless search, the State bears the burden of establishing that an exception to the warrant requirement is applicable. Id.

One recognized exception to the warrant requirement is a valid consent to search. Id. (citing Krise v. State, 746 N.E.2d 957, 961 (Ind. 2001)). When an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable. Id. When seeking to rely upon consent to justify a warrantless search, the State bears the burden of proving that the consent was freely and voluntarily given Id. at 651.

The voluntariness of the consent to search is to be determined by considering the totality of the circumstances. Id. A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. Crocker v. State, 989 N.E.2d 812, 820 (Ind. Ct. App. 2013), trans. denied.

7

The "totality of the circumstances" from which the voluntariness of a [defendant]'s consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his Miranda rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search.

Id. at 820-21 (citing State v. Scheibelhut, 673 N.E.2d 821, 824-25 (Ind. Ct. App. 1996)).

The determination of whether consent in this context was voluntary is a question of fact, and a reviewing court is ill-equipped to make factual determinations, especially where the evidence is conflicting. Scheibelhut, 673 N.E.2d at 824-25.

B. *Validity of Wireman's Consent*

In the present case, Bulthuis argues that Wireman did not validly consent.[1] In support of his argument, Bulthuis claims that Wireman was unaware that she did not have to allow the police officers into her home and that Lt. Hodson never actually explained that he planned to search her home. We disagree. Even if Wireman did testify that she was unaware of her ability to refuse to consent, the totality of the circumstances support the trial court's ruling.

Lt. Hodson testified that Wireman allowed him and DCS caseworker Allen into her home and agreed to let Lt. Hodson search her home for Bulthuis. After Bulthuis was found and taken into custody, Lt. Hodson asked if he could search Wireman's garage

---

[1] The State does not argue that Bulthuis did not have "standing" to challenge the search, noting that the prosecuting attorney conceded the standing issue in the trial court. See Suppression Hearing Tr. p. 91.

8

because of the report that Bulthuis had been manufacturing methamphetamine. On appeal, Bulthuis makes much of the fact that Lt. Hodson testified that he asked if he could "look" in the garage, which Bulthuis claims is not equivalent to asking for permission to conduct a search. In context, however, it is clear from Lt. Hodson's testimony that he asked for permission to search and not merely to visually inspect the premises.

At the suppression hearing, Lt. Hodson testified:

A.  I asked, I asked her specifically can I look in garage because I'd seen pretty much the rest of the [house] throughout the contact and she said yeah. And as I to open the door, she said why, and I said well our information is that someone's making Meth here so I, *I'll need to check for that* and . . .

Q.  And what was her response?

A.  She said yeah go ahead and she waved her hand like this.

Suppression Hearing Tr. p. 26 (emphasis added). Lt. Hodson's testimony at trial was consistent with this. When asked why he asked to "check" Wireman's garage, he explained:

At this point that was pretty much the only room I hadn't seen yet and the original complaint had mentioned again meth being made there. *So I asked her if I could check the kitchen or the garage and she said yeah, sure*, but why? And I told her straight up was that part of our information was that there was meth being made there. And she said okay, yeah, go ahead, and she said go ahead.

Trial Tr. p. 153 (emphasis added). From this, the trial court could reasonably conclude that Lt. Hodson asked for consent to search the garage for evidence of methamphetamine manufacturing and that Wireman gave such consent.

9

Moreover, after discovering some evidence of methamphetamine manufacturing and removing the occupants from the house, Lt. Hodson obtained a written consent to search from Wireman.[2] And when Wireman was removed from the scene due to the warrant for her arrest, Lt. Hodson sought and obtained a search warrant because Wireman was no longer there to revoke her consent.

Although there is no indication that Lt. Hodson informed Wireman of her right to refuse consent or advised her of her Miranda rights prior to asking if he could search her house, at that point Wireman was not in custody and there was no requirement that she be advised of her Miranda rights. Moreover, Lt. Hodson was not deceptive about his identity: he was dressed in a full police uniform and drove a marked police car. Nor was he deceptive about the purpose of the search: he informed Wireman of the report of methamphetamine manufacturing and asked if he could "check for that." Suppression Tr. p. 26. Lt. Hodson did not make any claim of authority to search without consent, and there is no indication that he or Allen were engaged in any illegal activity prior to the request. And Wireman had been cooperative throughout her encounter with Lt. Hodson and Allen. Considering the totality of the circumstances, we are unable to agree with Bulthuis that the trial court abused its discretion in determining that Wireman freely and voluntarily consented to the search of her house and garage.

---

[2] Although Wireman testified at the suppression hearing that she was unaware that she was signing a consent to search her home, the trial court was not required to credit her testimony, especially considering her testimony that Bulthuis was her "best friend." Suppression Hearing Tr. p. 59.

C. *Opportunity to Object to Search*

Bulthuis also complains that he was never given an opportunity to object to the search, citing Georgia v. Randolph, 547 U.S. 103 (2006).  In that case, the defendant and his wife were estranged, and the wife had moved to Canada with her parents for several weeks.  After she returned to the marital residence, she and the defendant were involved in a domestic dispute, and the police were summoned to the residence.  At the residence, the wife told the police that her husband abused cocaine and that there was evidence of cocaine use in the home.  The police asked the defendant for his consent to search the house and he "unequivocally refused."  Id. at 107.  The police then asked the wife for consent to search, which she gave.  The police found evidence of cocaine use and small amounts of cocaine.

On appeal from his conviction for possession of cocaine, Randolph claimed that the police search of his home was unconstitutional given his refusal of consent.  The United States Supreme Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant."  Id. at 122-23.  Accordingly, in that case, Randolph's unequivocal refusal to consent to the search effectively negated the consent of his wife.  Id.

Here, Bulthuis claims that Randolph should be extended to cover a situation where one occupant consents but the other occupant "is present, but secreted in a location while the issue of consent is intentionally withheld."  Appellant's Br. at 17.  We disagree.  This situation was explicitly addressed by the Court in Randolph, when the court distinguished

11

its holding from its prior holdings in Illinois v. Rodriguez, 497 U.S. 177 (1990), and United States v. Matlock, 415 U.S. 164 (1974).

In Matlock, the court held that the voluntary consent of one occupant of an area was sufficient to allow the search of an area that the occupant shares authority over when the other occupant is not present. 415 U.S. at 170 ("the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared."). The defendant in Matlock was in custody in a squad car not far away from the premises to be searched. And in Rodriguez, the Court extended this holding to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. 497 U.S. at 186. The defendant in Rodriguez was actually in the house, but asleep at the time of the search. Id. at 179.

In distinguishing these two cases from its holding, the Randolph Court admitted that it was "drawing a fine line" between these situations, writing:

> if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out. *This is the line we draw, and we think the formalism is justified.* So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

Randolph, 547 U.S. at 121-22 (emphasis added). And more recently, the Court noted that Randolph is "limited to situations in which the objecting occupant is present" and

explicitly held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." Fernandez v. California, 134 S. Ct. 1126, 1133-34 (2014).

Here, there is no indication that the police removed Bulthuis from the scene simply for the sake of avoiding a possible objection. To the contrary, the police, responding to a report of methamphetamine manufacturing by a man with Bulthuis's first name, were invited into Wireman's home and given consent to search for Bulthuis. When they discovered Bulthuis hiding in a closet, they removed him and found that he had an active warrant for his arrest. Under these facts and circumstances, the voluntary consent of the occupant, Wireman, was sufficient to allow the police to search the premises. The police were under no obligation to approach Bulthuis and ask if he had an objection to search. See Randolph, 547 U.S. at 121-22; Fernandez, 134 S.Ct. at 1334.

In short, the trial court did not abuse its discretion in concluding that Wireman's consent to search her house and garage was voluntarily given, nor were the police required to give Bulthuis an opportunity to object to the search after he had been taken into custody in a police vehicle. Accordingly, the trial court properly admitted the evidence of methamphetamine manufacturing seized during the consensual search of Wireman's home and garage.

## II. Sufficiency of the Evidence

Bulthuis next claims that the State presented insufficient evidence to support his conviction for dealing in methamphetamine. In reviewing such a claim, our standard of review is well settled:

13

When reviewing a claim of insufficient evidence, we neither reweigh the evidence nor judge the credibility of the witnesses. We consider only the evidence most favorable to the verdict and the reasonable inferences that can be drawn from this evidence. We will not disturb the jury's verdict if there is substantial evidence of probative value to support it. A reviewing court respects the jury's exclusive province to weigh conflicting evidence.

Fuentes v. State, 10 N.E.3d 68, 75 (Ind. Ct. App. 2014), trans. denied.

Here, the State charged Bulthuis with dealing in methamphetamine as follows: "On or about August, 2013, Dale Allen Bulthuis, III did knowingly or intentionally manufacture methamphetamine, pure or adulterated." Appellant's App. p. 29. This tracks the statutory language, which provides that "A person who . . . knowingly or intentionally . . . manufactures . . . methamphetamine, pure or adulterated . . . commits dealing in methamphetamine, a Class B felony[.]" Ind. Code § 35-48-4-1.1(a) (2013).

Bulthuis admits that there was evidence establishing that someone had manufactured methamphetamine in Wireman's garage at "some unknown point in the past," but claims that "evidence of historical manufacturing" is insufficient to support his conviction. Bulthuis notes that the police did not discover an "active" methamphetamine lab and did not recover any pseudoephedrine, a precursor to the manufacture of methamphetamine.[3] In support of his claim, Bulthuis cites Vanzyll v. State, 978 N.E.2d 511 (Ind. Ct. App. 2012). In our opinion, however, this case supports the conclusion that the State did present evidence sufficient to prove that Bulthuis manufactured methamphetamine.

---

[3] See Ind. Code § 35-48-4-14.5(a)(2) (2013).

14

In Vanzyll, the police executed a search warrant on the defendant's residence and discovered:

> liquid that tested positive for the presence of methamphetamine, a fuel can that tested positive for ammonia, a bottle which tested positive for hydrochloric acid gas, containers with white solid crystals, lye, and drain opener. In Vanzyll's bedroom, the officers found identification, cash, a Ziploc bag with white residue, which tested positive for the presence of methamphetamine, digital scales, and a glass methamphetamine pipe. The officers also found remnants of a methamphetamine lab in a trash bag in the basement of the residence.

Id. at 514. On appeal, the defendant claimed that the evidence was insufficient to prove that he manufactured methamphetamine because there was no evidence of an active methamphetamine lab. This court rejected Vanzyll's contention, noting first that the statutory definition of "manufacture" broadly provides:

> (1) the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container.

Id. at 517 (quoting Ind. Code § 35-48-1-18).

In Vanzyll, the officers involved in the search testified at trial that the residence smelled strongly of ammonia, a common trait of methamphetamine manufacturing. The State also presented evidence that the items seized were commonly used in the manufacture of methamphetamine. Vanzyll, however, did not cite to any case requiring that there be evidence of an "active" methamphetamine lab to prove "manufacturing" as defined by statute. Id. at 518. We therefore held that the evidence presented was sufficient to support Vanzyll's conviction because, "[a]lthough no law enforcement

15

officer specifically testified that the methamphetamine lab was active, the evidence . . . was sufficient for the jury to conclude that Vanzyll was in the process of manufacturing methamphetamine, which had not yet been reduced to its final solid form." Id. at 519.

We reach a similar conclusion in the present case. Bulthuis was found hiding in a home where the police later found items commonly used to manufacture methamphetamine, including empty boxes of "cold packs," lithium battery shavings, empty bottles of starting fluid, camping fuel, drain cleaner, digital scales, pieces of aluminum foil, coffee filters, and an HCl generator. The police also found a plastic bag with a white residue which later tested positive as methamphetamine. The State presented testimony from an ISP detective that, based upon the evidence seized, methamphetamine had been manufactured using the "one pot" method. Trial Tr. p. 282. Further, both Bulthuis and Wireman had recently purchased relatively large quantities of pseudoephedrine. And when interviewed by the police, Bulthuis made statements indicating that he had been involved with the manufacture of methamphetamine. Indeed, he admitted that he obtained pseudoephedrine to make "a couple [of] extra bucks," and that the bottle found in the garage was "the last one." Ex. Vol., State's Ex. 74T, pp. 12, 14.

From this, the jury could reasonably conclude that Bulthuis had been manufacturing methamphetamine, whether or not the police discovered an "active" lab. See Vanzyll, 978 N.E.2d at 517; see also Hill v. State, 825 N.E.2d 432, 437-38 (Ind. Ct. App. 2005) (evidence sufficient to prove defendant manufactured methamphetamine, even though no finished methamphetamine was found, where police did find a mirror

16

with a small pipe on it, a handgun, several jars, starting fluid cans with holes in the bottoms, an empty salt container, a coffee grinder, an aspirin bottle with pseudoephedrine tablets, and a bottle of acetone). The State presented evidence sufficient to support Bulthuis's conviction for Class B felony dealing in methamphetamine.

### III. Restitution

Lastly, Bulthuis contends that the trial court erred in ordering him to pay restitution for the cleanup expenses incurred by the State in removing the items found in Wireman's garage that had been used to manufacture methamphetamine. Bulthuis cites the opinion of this court in Edsall v. State, 983 N.E.2d 200, 208 (Ind. Ct. App. 2013), reh'g denied. In that case, the defendant was ordered to pay the State over $19,000 in restitution to cover the costs of the undercover investigation of the defendant. The restitution in that case was purportedly authorized by the general restitution statute, Indiana Code 35-50-5-3(a) (2013), which provides that "[i]n addition to any sentence imposed under this article for a felony or misdemeanor, the court may, as a condition of probation, or without placing the person on probation, order the person to make restitution to the victim of the crime, the victim's estate, or the family of a victim who is deceased." On appeal, we held that the State was not a "victim" for purposes of the general restitution statute. Id. at 219. Bulthuis argues that the same is true here. We disagree.

In the present case, the trial court's award of restitution was specifically authorized by another restitution statute, which provides:

> (a) In addition to any other penalty imposed for conviction of an offense under this chapter involving the manufacture or intent to manufacture methamphetamine, a court *shall* order restitution under IC 35-50-5-3 to cover the costs, if necessary, of an environmental cleanup incurred by a law enforcement agency or other person as a result of the offense.
>
> (b) The amount collected under subsection (a) shall be used to reimburse the law enforcement agency that assumed the costs associated with the environmental cleanup described in subsection (a).

Ind. Code § 35-48-4-17 (2013) (emphasis added). Under this statute, the trial court is required to order the defendant to pay restitution to cover the costs of any environmental cleanup incurred by the State as a result of the defendant's manufacture of methamphetamine.

Here, the State submitted into evidence a document entitled "Clandestine Lab Cost Estimator," produced by the Methamphetamine Suppression Section of the ISP. According to this document, the ISP incurred costs of $2,443.44 to clean up the methamphetamine lab found in Wireman's garage. Appellant's App. p. 122. This is the amount that the trial court ordered Bulthuis to pay in restitution to the State. As this is not only permitted, but required by the relevant statute, we cannot say that the trial court abused its discretion by ordering Bulthuis to pay restitution to cover the cleanup costs of the garage lab where he had manufactured methamphetamine.

## Conclusion

The trial court did not abuse its discretion in admitting into evidence the items seized during the search of Wireman's garage: Wireman voluntarily consented to the search, and the police were not required to give Bulthuis, who was in custody in a police car on an active warrant for his arrest, an opportunity to object to the search. The State

18

presented evidence sufficient to support Bulthuis's conviction for dealing in methamphetamine: in addition to the presence of precursors and a manufacturing setting, the police found methamphetamine residue, Bulthuis and Wireman had recently purchased relatively large amounts of pseudoephedrine, and Bulthuis made statements implicating himself in the manufacture of methamphetamine. The State was not required to present evidence of an active methamphetamine lab. Lastly, the trial court's restitution order requiring Bulthuis to pay the State for the costs incurred during the cleanup of the lab was specifically authorized, and indeed required, by the relevant restitution statute.

Affirmed.

RILEY, J., and CRONE, J., concur.