## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 04 2015, 10:38 am
CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Paul Stephen Miller<br>Fort Wayne, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Eric P. Babbs<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Renald Williams, Sr.,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff,* | June 4, 2015<br><br>Court of Appeals Case No.<br>02A04-1409-CR-412<br><br><br>Appeal from the Allen Superior Court<br>Honorable Wendy W. Davis, Judge<br>Cause No. 02D04-1309-FB-166 |

**Robb, Judge.**

## Case Summary and Issues

[1] Following a bench trial, Renald Williams, Sr., was convicted of dealing in methamphetamine as a Class B felony and possession of chemical reagents or

precursors with intent to manufacture as a Class D felony. He received an aggregate sentence of nineteen years.

[2] Williams appeals, raising the following five issues for our review: (1) whether he voluntarily, knowingly, and intelligently waived his constitutional right to a jury trial; (2) whether the trial court abused its discretion by admitting evidence obtained as a result of a warrantless search; (3) whether his convictions violate federal and state constitutional prohibitions against double jeopardy; (4) whether the trial court abused its discretion in sentencing him; and (5) whether his sentence is inappropriate in light of the nature of the offenses and his character.

[3] Concluding that Williams validly waived his right to a jury trial, that the trial court did not abuse its discretion by admitting evidence, and that Williams's convictions do not violate double jeopardy principles, we affirm his convictions. Further concluding that the trial court did not abuse its sentencing discretion and that Williams's sentence is not inappropriate, we affirm his sentence.

## Facts and Procedural History

[4] On September 13, 2013, the Fort Wayne Police Department received an anonymous tip regarding a suspected methamphetamine lab at 1131 Summit Street in Fort Wayne. Three police officers responded to the call around midnight. Upon arrival, the officers knocked on the front door of the house.

When Thomas Hempel answered the door,[1] the officers informed him that they were conducting a drug investigation and asked if they could come inside to speak with him. Hempel agreed and invited them inside.

Hempel spoke with the officers in the entryway between the living room and the kitchen. Hempel told the officers that he lived in the apartment, and when the officers asked if there was anyone else currently in the apartment, he said that his girlfriend was in the bedroom. He also said they were "free to look around." Transcript of Trial at 12. As the officers were speaking with Hempel, they noticed a pile of salt, latex gloves, and plastic bottles in the kitchen trashcan—items consistent with the production of methamphetamine. Suspecting methamphetamine production somewhere in the apartment, they asked Hempel if they could speak to his girlfriend.

Hempel walked through the kitchen to the bedroom door and pushed the door slightly open, only "wide enough that he could speak to whoever was inside." Id. at 28. Detective Marc Deshaies followed and stood behind him. As Hempel attempted to tell his "girlfriend" to come out, Detective Deshaies detected the odor of methamphetamine production and saw that the entire bedroom was filled with white smoke. Mindful of the dangers of an active methamphetamine lab, the officers entered the bedroom. A woman was standing near the doorway, and Williams was crouched in the middle of the

---

[1] The house at 1131 Summit Street is a two-story building that has been divided into separate apartments. Hempel lived in the apartment on the first floor.

room.  Williams was holding a vapor-filled bag, and the smoke appeared to be coming from his immediate area.  A third individual was sitting in an armchair to the right of Williams.[2]

[7]  The officers promptly evacuated the house, called the fire department, and requested assistance from the methamphetamine cleanup team.  Detective Robert Kirby interviewed Hempel, who stated that he was renting the apartment and was the only person named on the lease.  When Detective Kirby asked for consent to search the apartment, Hempel consented to the search.  The search revealed the following items in the bedroom where Williams was found:

- A "one pot meth lab;"
- A hydrochloric gas generator;
- "Liquid Fire" drain opener containing sulfuric acid;
- Coleman fuel, an organic solvent;
- Canisters of table salt;
- Unused coffee filters;
- Six feet of vinyl tubing;
- Lithium batteries;
- One zip lock bag containing ammonium nitrate;
- One "foil boat" with burnt residue;
- One zip lock bag containing "a white cloudy liquid" that tested positive for methamphetamine;
- Lye drain opener;
- An instant cold pack containing ammonium nitrate;
- A coffee grinder with residue that tested positive for pseudoephedrine;

---

[2] Hempel testified at trial that he did not know the two individuals in the bedroom with Williams.

- One coffee filter that had been used as a strainer;
- A glass pipe with burnt residue; and
- Several pairs of pliers, typically used to remove lithium from batteries.

*Id.* at 39-48. Officers found a second "one pot meth lab" in the freezer in the kitchen and another hydrochloric gas generator in the kitchen trashcan. *Id.* at 49.

[8] During an interview a few days after his arrest, Williams admitted that he "was cooking in the back room" and that he "told Mr. Hempel that he had a female in the back bedroom to keep Mr. Hempel out of the room." *Id.* at 71. Williams provided "a very detailed description of how he manufactures meth," *id.* at 70, and admitted to selling methamphetamine.

[9] Williams was charged with dealing in methamphetamine as a Class B felony and possession of chemical reagents or precursors with intent to manufacture as a Class D felony. During a hearing on March 27, 2014, the following exchange took place:

> [Defense counsel:] Over the weekend I received a letter from Mr. Williams . . . [i]ndicating that he wants me to file a motion to suppress and because we're up against our trial date which I'm going to be gone next week and the trial date is the week after. He wants to waive his right to a jury trial and set this for a bench trial so we can discuss important issues that may – that may have an effect on this case. . . .
>
> Court: Your attorney is telling me that you would like to waive your right to a jury trial and have this tried to me essentially, is that correct?
>
> [Defendant:] Yes.

Court: All right. And you understand what that means, that you have a right to a trial by jury and all the other rights attached to a jury trial? Have you discussed the waiver with your counsel?

[Defendant:] Not fully, but I will grant it.

Court: Okay. All right. Any objection from the State?

[Prosecutor:] No, Your Honor.

Court: All right. I will go ahead then and note – note that he has waived his right to a jury trial.

Transcript of Hearing at 7-8. Williams did not sign a written waiver.

[10] The parties agreed to set the matter for a combined suppression hearing and bench trial on April 9, 2014, and the trial court instructed defense counsel to file a written motion to suppress prior to that date. On July 8, 2014, following several continuances, Williams sent a letter to the trial court and filed a pro se motion to suppress. The letter stated in relevant part:

> [My attorney] has failed to file the suppression that I've asked him to do. . . . The suppression was supposed to be filed prior to our original trial date of April 9, 2014. That was one of the reasons why I waived my jury trial rights on March 27, 2014. I wanted to place myself completely under your discretion versus 12 jurors whom may be ignorant or incompetent to the law.

Appendix of Appellant at 68.

[11] The combined suppression hearing and bench trial took place on July 14, 2014. After hearing the evidence, the trial court denied the motion to suppress and

found Williams guilty on both counts. The trial court sentenced Williams to nineteen years for dealing in methamphetamine, with seventeen years executed in the Department of Correction and two years suspended to probation, to be served concurrently with a three year executed sentence for possession of chemical reagents or precursors. Williams now appeals.

# Discussion and Decision

## I. Waiver of the Right to a Jury Trial

[12] The right to trial by jury is a fundamental right guaranteed by the Sixth Amendment to the U.S. Constitution and by Article 1, Section 13 of the Indiana Constitution. *Coleman v. State*, 694 N.E.2d 269, 278 (Ind. 1998). A defendant's waiver of the right "must be voluntary, knowing, and intelligently made with sufficient awareness of the relevant circumstances surrounding its entry and its consequences." *O'Connor v. State*, 796 N.E.2d 1230, 1233 (Ind. Ct. App. 2003) (citation omitted). Williams contends that he did not knowingly and voluntarily waive his right to a jury trial.

[13] Denying a defendant a jury trial in the absence of a knowing, voluntary, and intelligent waiver is fundamental error. *Johnson v. State*, 6 N.E.3d 491, 496 (Ind. Ct. App. 2014). A valid waiver requires affirmative action by the defendant, *O'Connor*, 796 N.E.2d at 1233, and "must be elicited personally from the defendant, either orally in open court or in writing." *Reynolds v. State*, 703 N.E.2d 701, 704 (Ind. Ct. App. 1999). This court has determined:

> A voluntary waiver occurs if the conduct constituting the waiver is the product of a free will; a knowing waiver is the product of an informed will; an intelligent waiver is the product of a will that has the capacity to understand; and a waiver is personal if it is made by the defendant.

*Id.* (citation omitted).

Williams argues that his waiver was not an informed decision for two reasons. First, at the time of the waiver, Williams told the trial court that he had "not fully" discussed his rights with counsel. Tr. of Hearing at 8. Second, following Williams's statement that he had "not fully" discussed his rights, the trial court did not conduct an oral advisement of rights. *Id.* However, there is nothing in the record to suggest that Williams did not understand his right to a jury trial and the consequences of waiving that right. Although the defendant's personal desire to waive the right must be apparent from the record, there is no requirement that a trial court orally advise a defendant of his or her right to a jury trial and the consequences of waiving that right. *McSchooler v. State*, 15 N.E.3d 678, 682-83 (Ind. Ct. App. 2014). Nor is counsel required "to explain each and every possible detail concerning a jury trial in order for the defendant to be sufficiently informed . . . ." *Reynolds*, 703 N.E.2d at 704.

Williams's significant criminal history, including six prior felony convictions, "suggests a high level of familiarity with the judicial process, making it quite likely that he knew what a 'jury' was." *Poore v. State*, 681 N.E.2d 204, 207 (Ind. 1997). Williams demonstrated his knowledge in his letter to the trial court when he stated that a jury would be composed of twelve laypersons. In addition, Williams was represented by counsel when he waived his right to a

jury trial. At the hearing on March 27, 2014, Williams's attorney stated that Williams wanted to waive his right to a jury trial "so we can discuss important issues that may . . . have an effect on this case." Tr. of Hearing at 8. This statement implies that Williams was acting upon the advice of legal counsel, and that the decision to waive the right to a jury trial was a strategic one. *See McSchooler*, 15 N.E.3d at 683.

[16] The letter that Williams sent to the trial court, read in light of his attorney's arguments at sentencing, further suggests that Williams waived his right to a jury trial for strategic reasons. Williams wrote that the motion to suppress was "one of the reasons why [he] waived his jury trial rights." App. of Appellant at 68. He did not trust a jury of his peers—individuals who "may be ignorant or incompetent to the law"—because his primary defense was alleging a violation of the Fourth Amendment. *Id.* At sentencing, his attorney stated as much:

> He requested a bench trial so that he could contest what he perceived to be a violation of his Fourth Amendment Rights. We didn't want to do a jury trial because all along, he . . . accepted the fact that he was caught in the act and . . . there was enough evidence to convict him otherwise.

Transcript of Sentencing at 5-6. Evidence of waiver as a deliberate strategy supports the trial court's conclusion that Williams made an informed decision when he waived his right to a jury trial. *See McSchooler*, 15 N.E.3d at 683.

[17] Williams also contends that the waiver was not voluntary because it was "conditioned on a motion to suppress being filed," and "the only suppression motion was that filed by [Williams] and not his counsel." Brief of Appellant at

9. The State argues that "subsequent action or inaction by either party's counsel could not undo [the waiver's] voluntariness." Brief of Appellee at 13 n.7. We disagree with the State's proposition. *See Williams v. State*, 159 Ind. App. 470, 476-77, 307 N.E.2d 880, 884-85 (1974) (finding an abuse of discretion when the trial court did not permit the withdrawal of a jury trial waiver "predicated upon a bargain struck with the prosecution" after plea negotiations failed). Nevertheless, we conclude that Williams's waiver was voluntary.

[18] Williams opted for a bench trial to "contest what he perceived to be a violation of his Fourth Amendment Rights," and a motion to suppress was indeed filed before trial. Tr. of Sentencing at 5. Williams's statement regarding a motion to suppress being one of the reasons for waiver reveals his defense strategy. The statement does not make the waiver conditional, as Williams argues.

[19] Once Williams believed that his attorney would not be filing a motion to suppress, Williams filed a pro se motion. He at no point requested to withdraw his waiver, and he did not object when the bench trial was held. *See Johnson*, 6 N.E.3d at 497 ("[S]ubmission to a bench trial [is] one piece of evidence, among others, supporting a waiver."). Although Williams likely did not anticipate filing the motion to suppress without the assistance of counsel, we have stated that a "mere allegation" of ineffective assistance is insufficient to invalidate a jury trial waiver. *See Kindle v. State*, 161 Ind. App. 14, 22-23, 313 N.E.2d 721, 726-27 (1974).

In light of all of these factors, we conclude that Williams knowingly, voluntarily, and intelligently waived his right to a jury trial.

# II.  Warrantless Search

## A.  Standard of Review

Williams next contends that the search of Hempel's bedroom violated his Fourth Amendment rights[3] because the police obtained invalid consent to conduct the search.  When a defendant challenges the constitutionality of a search following a completed trial, the issue becomes whether the trial court abused its discretion by admitting the evidence found during the search. *Bulthuis v. State*, 17 N.E.3d 378, 382 (Ind. Ct. App. 2014), *trans. denied*.  The trial court abuses its discretion only if its decision was clearly against the logic and effect of the facts and circumstances before it, or if the trial court has misinterpreted the law.  *Id.* at 382-83.

In reviewing the trial court's ruling, we do not reweigh the evidence but defer to the trial court's factual determinations unless clearly erroneous.  *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009).  We view conflicting evidence most favorably to the trial court's ruling.  *Id.*  However, we also consider any undisputed evidence favorable to the defendant.  *State v. Cunningham*, 26

---

[3] Williams's only reference to the Indiana Constitution is his assertion that "[t]he Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution protect an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures." Br. of Appellant at 11. Because Williams "presents no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived." *Lockett v. State*, 747 N.E.2d 539, 541 (Ind. 2001).

N.E.3d 21, 25 (Ind. 2015) (citation omitted). Finally, although the trial court's factual determinations are entitled to deferential review, the constitutionality of a search is a question of law that we review de novo. *Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied*.

## B. Admission of Evidence

[23] "To trigger Fourth Amendment protections, a search arises out of an intrusion by a government actor upon an area in which a person maintains a reasonable expectation of privacy." *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006) (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)) (internal quotation marks omitted). Williams contends that he was an overnight guest with a reasonable expectation of privacy in Hempel's bedroom. While it is true that overnight guests may claim the protection of the Fourth Amendment, we do not believe Williams falls in this category.

[24] The U.S. Supreme Court, in *Minnesota v. Carter*, distinguished overnight guests from those who are "merely present with the consent of the householder . . . ." 525 U.S. 83, 90 (1998) (citing *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990)). Our supreme court has similarly distinguished overnight guests from "casual guests." *See Gray v. State*, 593 N.E.2d 1188, 1191 (Ind. 1992). The casual guest lacks standing to challenge a search because he or she has no legitimate expectation of privacy in the premises. *Id.* We believe Williams was a casual guest.

In *Carter*, the U.S. Supreme Court held that a defendant who was in another person's apartment for the sole purpose of packaging cocaine was merely a casual guest. 525 U.S. at 90-91. The defendant had never been to the apartment before, stayed for less than three hours, and paid the tenant in cocaine for his use of the apartment. We confronted a similar set of facts in *Gregory v. State*, 885 N.E.2d 697 (Ind. Ct. App. 2008), *trans. denied*. Gregory agreed to manufacture methamphetamine at his codefendant's mother's house. His codefendant's mother was out of town at the time, and we held that Gregory was "just a mere visitor" to the property and lacked standing to challenge the search that occurred there. *Id.* at 704. Likewise in *Best v. State*, 821 N.E.2d 419 (Ind. Ct. App. 2005), *trans. denied*, the defendant argued that he was an overnight guest in a camper trailer because he had paid to use it to manufacture methamphetamine. Best had been to the property where the camper trailer was parked "a dozen or more times but had never stayed overnight." *Id.* at 422. He had "never used the camper trailer as a dwelling place, but only for commercial purposes, and he was there only intermittently." *Id.* at 425. We held that Best was never an overnight guest "but was simply there to do business; that is, to manufacture methamphetamine." *Id.*[4]

---

[4] We further noted in *Best* that property used for commercial purposes is treated differently from residential property: "'An expectation of privacy in commercial premises is different from, and indeed less than, a similar expectation in an individual's home.' . . . Since the property was being used by Best for purely commercial purposes, it is treated differently than property used for residential purposes." *Id.* at 425 (quoting *Carter*, 525 U.S. at 90).

[26] On the other hand, in *Harless v. State*, 577 N.E.2d 245, 247-48 (Ind. Ct. App. 1991), a defendant who "had stayed overnight at [his girlfriend's] home on many occasions and on the evening preceding the day on which the search occurred," and who "paid several of the household utility bills," was considered an overnight guest. Similarly, in *Hanna v. State*, 726 N.E.2d 384, 387 n.4 (Ind. Ct. App. 2000), we held that a defendant who had stayed overnight at his friend's apartment over twenty times in the few months before the search was an overnight guest; in that case, the two individuals had been friends for five years.

[27] We believe that the present case resembles the facts of *Carter*, *Gregory*, and *Best*. At the time of the search, Hempel had known Williams for less than three weeks and did not even know Williams's real name.[5] Although Williams had a key to Hempel's apartment on the day of the search, Hempel testified that day was the first and only time he had ever given Williams a key. And Hempel did not believe that Williams would be staying the night. Hempel thought Williams would be going to a girlfriend's house and gave Williams a key so that Williams could "get cleaned up before he went on down there." Tr. of Trial at 94. Williams was not an overnight guest. He "was simply there to do business; that is, to manufacture methamphetamine." *See Best*, 821 N.E.2d at 425.

---

[5] Hempel knew Williams as "Twin" at the time of the search. Tr. of Trial at 92.

In short, Williams cannot challenge the search because he had no legitimate expectation of privacy in Hempel's bedroom.[6] We therefore hold that the trial court did not abuse its discretion by admitting evidence obtained as a result of the search.

# III.  Double Jeopardy

## A.  Standard of Review

Williams also argues that his convictions for dealing in methamphetamine by manufacturing and possession of chemical reagents or precursors with intent to manufacture violate federal and state constitutional prohibitions against double jeopardy.  We review whether multiple convictions violate double jeopardy de novo.  *Jones v. State*, 976 N.E.2d 1271, 1275 (Ind. Ct. App. 2012), *trans. denied*.

## B. United States Constitution

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or

---

[6] But even if Williams had been an overnight guest, Hempel had actual authority to consent to the search and provided valid consent.  *See, e.g.*, *Gado v. State*, 882 N.E.2d 827, 831-32 (Ind. Ct. App. 2008), *trans. denied*.  Hempel was the resident of the apartment.  He "sometimes" slept in the bedroom, but more often slept on the couch in the living room because the bedroom was quite small.  Tr. of Trial at 96.  As Hempel explained, the bedroom was "more like a closet for everything."  *Id.*  And notwithstanding frequent nights on the couch, Hempel referred to the bed in the bedroom as his own.  Even though Hempel had permitted Williams to use the room on occasion, Hempel could consent to the search in his own right.  *See Gado*, 882 N.E.2d at 832.

Williams erroneously suggests that overnight guests have a privacy interest that "cannot be invaded by law enforcement based on a third party's consent."  Br. of Appellant at 12.  In fact, "[i]t is well established that a third party may consent to a search of another's premises or property if actual authority exists."  *Lee v. State*, 849 N.E.2d 602, 606 (Ind. 2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990)), *cert. denied*, 549 U.S. 1211 (2007).  And the exception articulated in *Georgia v. Randolph*, 547 U.S. 103 (2006), applies only when a physically present co-occupant objects to a search.  Here, Williams did not object.

limb." To evaluate Williams's federal double jeopardy claim, we employ the well-established test announced in *Blockburger v. United States*: "[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304 (1932). Review is limited to the relevant statutes; the factual elements in the charging information and the jury instructions are not part of the inquiry. *Berry v. State*, 703 N.E.2d 154, 159 (Ind. 1998).

[31] Indiana Code section 35-48-4-1.1(a) (2013) provides, in relevant part: "A person who . . . knowingly or intentionally . . . manufactures . . . methamphetamine . . . commits dealing in methamphetamine, a Class B felony . . . ." Indiana Code section 35-48-4-14.5(e) (2013) provides, in relevant part: "A person who possesses two (2) or more chemical reagents or precursors with the intent to manufacture a controlled substance commits a Class D felony."[7]

[32] Dealing in methamphetamine by manufacturing and possession of chemical reagents or precursors with intent to manufacture do not constitute the same offense under *Blockburger* because each provision requires proof of a fact which the other does not. Dealing in methamphetamine by manufacturing requires that a defendant actually begin the process of manufacturing methamphetamine, whereas possession of chemical reagents or precursors with

---

[7] "Chemical reagents or precursors" are defined in Indiana Code section 35-48-4-14.5(a) (2013), and include the following: pseudoephedrine, ammonia solution, organic solvents, hydrochloric acid, lithium metal, sulfuric acid, sodium hydroxide (lye), and ammonium nitrate.

intent to manufacture methamphetamine does not require that the manufacturing process actually be initiated. *Bush v. State*, 772 N.E.2d 1020, 1024 (Ind. Ct. App. 2002), *trans. denied.* A defendant can possess chemical reagents or precursors with intent to manufacture without taking any steps toward actually manufacturing. Likewise, possession of chemical reagents or precursors with intent to manufacture requires proof that a defendant possessed at least two chemical reagents or precursors, but manufacturing methamphetamine does not. If, for instance, a defendant was in the late stages of the process of manufacturing methamphetamine and possessed only empty containers that had previously contained chemical reagents or precursors, that defendant would be guilty of manufacturing, but not of possession of chemical reagents or precursors. There is no federal double jeopardy violation because each offense requires proof of a fact which the other does not.

## C.  Indiana Constitution

[33]  Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." Our supreme court has concluded:

> [T]wo or more offenses are the same offense in violation of [A]rticle 1, [S]ection 14 if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to obtain convictions, the essential elements of one challenged offense also establish the essential elements of another challenged offense.

*Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013) (citing *Richardson v. State*, 717 N.E.2d 32 (Ind. 1999)). The statutory elements test is the test enunciated in

*Blockburger*. *Brown v. State*, 912 N.E.2d 881, 896 (Ind. Ct. App. 2009), *trans. denied*. Under the actual evidence test, we examine the evidence presented at trial to determine whether each offense was established by separate and distinct facts. *Garrett*, 992 N.E.2d at 719. To find a double jeopardy violation under the actual evidence test, we must conclude that there is a reasonable possibility that the evidentiary facts used to establish the essential elements of one offense may also have been used to establish all of the essential elements of a second challenged offense. *Id.*

[34] In *Iddings v. State*, 772 N.E.2d 1006 (Ind. Ct. App. 2002), *trans. denied*, and *Bush v. State*, 772 N.E.2d 1020, two cases decided on the same day, we addressed the circumstances in which a defendant's conviction for possession of chemical reagents or precursors would be a lesser included offense of dealing in methamphetamine by manufacturing. As we explained in *Iddings* and *Bush*, both convictions may stand if the evidence reasonably permits the conclusion that the defendant committed two independent offenses. In *Iddings*, the police recovered completed methamphetamine at the defendant's residence as well as precursors of methamphetamine in large quantities. 772 N.E.2d at 1017. We concluded that the evidence established two independent offenses because the defendant had already completed the process of manufacturing methamphetamine and possessed the precursors with intent to manufacture *more* methamphetamine. *Id.* We reached a different conclusion in *Bush*, where the defendant's "conviction for manufacturing methamphetamine was based exclusively on his possession of the precursors of that drug in circumstances

suggesting that he was in the process of manufacturing it." 772 N.E.2d at 1024. Bush's possession of precursors was not an independent offense because there was no evidence that he had succeeded in completing a "batch" of methamphetamine. *Id.*

[35] In *Scott v. State*, 803 N.E.2d 1231, 1240 (Ind. Ct. App. 2004), another case in which a defendant was convicted of both dealing by manufacturing and possession of chemical reagents or precursors, we held that the evidence supported the inference that two independent offenses had occurred, even though the police did not find completed methamphetamine on the defendant's property. Notwithstanding the absence of completed methamphetamine, the evidence permitted the conclusion that "actual methamphetamine had already been created." *Id.* The defendant stated that he was tired of people calling the police about the smell of ether emanating from this property, and the police found "punctured and burned starting fluid cans, empty mineral spirits cans, stripped out lithium batteries, and two plastic containers that were being used as [hydrochloric gas] generators" on his property. *Id.* Citing *Iddings*, we affirmed both convictions because the defendant also possessed the chemical reagents and precursors needed to manufacture additional methamphetamine. *Id.*

[36] Here, the evidence indicates that Williams had previously manufactured methamphetamine, had nearly completed another batch when he was discovered, and possessed materials to produce more methamphetamine. Williams admitted that he had previously manufactured methamphetamine and provided a very detailed description of the production process. Williams also

admitted to selling methamphetamine and even disclosed how much he charges for the finished product. In addition to the equipment found in the bedroom where Williams was actively manufacturing, police found a second "one pot meth lab" in the freezer and another hydrochloric gas generator in the kitchen trashcan. Tr. of Trial at 49. The bottle of Coleman fuel discovered in the bedroom tested positive for "a high level of ammonia," meaning that Williams had "re-used" the organic solvent. *Id.* Finally, Williams was at a late stage in the manufacturing process at the time of the search and had already produced methamphetamine. Police found liquid methamphetamine base, an intermediate mixture containing methamphetamine and organic solvents. The final step in the manufacturing process, known as "salting out" the methamphetamine, removes the methamphetamine from the solvent in order to produce the finished powder form. *Id.* at 84; *see also Buelna v. State*, 20 N.E.3d 137, 144 (Ind. 2014). The final step requires hydrochloric gas, and police found two hydrochloric gas generators—one in the bedroom with Williams and another that had been thrown away in the kitchen trashcan.

[37]  At the time of the search, Williams had already produced methamphetamine, was one step away from a finished product, and possessed chemical reagents and precursors in addition to what was needed to complete the process. The evidence supports the inference that two independent offenses occurred. We therefore conclude that each offense was established by separate and distinct facts.

# IV. Abuse of Sentencing Discretion

[38] Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. "An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id.* (citation and internal quotation marks omitted). A trial court abuses its discretion at sentencing if it: (1) fails to enter a sentencing statement; (2) enters a sentencing statement that explains reasons for imposing a sentence, but the record does not support the reasons; (3) enters a sentencing statement that omits reasons that are clearly supported by the record and advanced for consideration; or (4) gives reasons that are improper as a matter of law. *Id.* at 490-91. If we determine that the trial court has abused its discretion, we will remand for resentencing "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id.* at 491.

[39] Williams contends that the trial court abused its discretion by entering a sentencing statement with a reason that was unsupported by the record. The trial court found the following aggravating circumstances on the written judgment of conviction: "Criminal history includes 1 misdemeanor, 6 felonies of which are robbery, unlawful use of a weapon, battery, escape, strangulation and on parole when he committed this offense." App. of Appellant at 73. Williams argues that the trial court abused its discretion by finding that he has a

prior conviction for robbery as a felony; in fact, Williams has only a juvenile adjudication for robbery.  Yet notwithstanding the mischaracterization of the juvenile adjudication as an adult conviction on the judgment of conviction, the trial court's assertion that Williams has six prior felony convictions was accurate.

[40]     Williams has been convicted of the following felonies as an adult:  (1) possession of a stolen vehicle; (2) unlawful use of a weapon; (3) domestic battery; (4) escape; (5) strangulation; and (6) possession of methamphetamine. In addition to his six prior felony convictions as an adult, Williams was adjudicated delinquent for committing an act that would have been felony robbery if committed by an adult.  At the sentencing hearing, the trial court listed seven felony-level offenses, but concluded by stating that Williams had only six prior felony convictions. Because the trial court was permitted to consider Williams's history of delinquent behavior,[8] and the record supports the trial court's statement that Williams has six prior felony convictions as an adult, we hold that the trial court did not abuse its discretion when it mischaracterized Williams's juvenile adjudication as an adult conviction. *Cf. Bethea v. State*, 983 N.E.2d 1134, 1141 (Ind. 2013) (concluding that the trial's court's misstatement that defendant "had been convicted of possession of cocaine with intent to distribute, when in fact he had pled guilty to the lesser included offense of

---

[8] Indiana Code section 35-38-1-7.1(a) provides: "In determining what sentence to impose for a crime, the court may consider the following aggravating circumstances: . . . The person has a history of criminal or delinquent behavior."

possession of cocaine" was "not significant" because the error "did not change the fact that [the defendant] had in fact been convicted of a felony for possessing cocaine, which was also part of a pattern of [the defendant's] involvement in criminal activity").

# V. Appropriateness of Sentence

[41] Finally, Williams contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden of persuading this court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[42] Regarding the nature of the offense, the advisory sentence is the starting point that the legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. Williams was convicted of dealing in methamphetamine as a Class B felony and possession of chemical reagents or precursors with intent to manufacture as a Class D felony. A person who commits a Class B felony is subject to a sentence of six to twenty years, with the

advisory sentence being ten years. Ind. Code § 35-50-2-5. Likewise, a person who commits a Class D felony is subject to a sentence of six months to three years, with the advisory sentence being one-and-a-half years. Ind. Code § 35-50-2-7.

[43] Here, the trial court sentenced Williams to nineteen years for the dealing conviction and three years for possession of chemical reagents or precursors, to be served concurrently. Seventeen of the nineteen years are to be served in the Department of Correction, followed by two years of probation.[9] Williams told police that he not only "cooks" but also sells methamphetamine and often accepts pseudoephedrine as payment. Tr. of Trial at 71-74. Moreover, twenty-seven-year-old Williams was manufacturing methamphetamine in an apartment that did not belong him; the apartment belonged to sixty-six-year-old Hempel. Hempel had known Williams for just over two weeks the day the methamphetamine lab was discovered. That day, Williams drove Hempel to Grabill, a small town outside of Fort Wayne. After dropping off Hempel, Williams went back to Hempel's apartment to manufacture methamphetamine while Hempel was away, and when Hempel returned home, Williams told Hempel "that he had a female in the back bedroom to keep . . . Hempel out of the room." *Id.* at 71. Williams was manufacturing methamphetamine in an

---

[9] Williams argues that we should reduce his sentence because the maximum possible sentence is reserved for the "worst of the worst." Br. of Appellant at 18. Williams correctly states the law in Indiana. *See Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011). However, Williams did not receive the maximum sentence on the lead charge, and an "approximation" of the maximum sentence is not the same as the maximum possible sentence. Br. of Appellant at 17.

apartment that was not his, possibly without the tenant's knowledge, and in so doing exposed innocent bystanders to the dangers of an active methamphetamine lab. *See Holder*, 847 N.E.2d at 939 ("[T]he production of methamphetamine introduces a high risk of explosion and fire.").

[44] Williams acknowledges that manufacturing methamphetamine "creates a serious and dangerous situation" but argues that his character does not warrant a nineteen-year sentence. Br. of Appellant at 17. Williams contends that his sentence should be reduced because "he has an extremely serious drug abuse problem." *Id.* We have previously stated, however, that "substance abuse reflects poorly upon [a defendant's] character." *Calvert v. State*, 930 N.E.2d 633, 644 (Ind. Ct. App. 2010). Furthermore, in the present case, Williams was convicted of not merely possession but *dealing* in methamphetamine, a far more serious offense that is not directly related to his addiction. As Williams has never undergone treatment or otherwise addressed his substance abuse, he has failed to convince us that his addiction merits a reduced sentence.

[45] As to Williams's character more generally, at twenty-seven-years-old, Williams has six prior felony convictions. His prior convictions include unlawful use of a weapon, domestic battery, and strangulation. Williams has been sentenced to executed time in the Department of Correction for each prior felony conviction and has continued to reoffend. He was on parole at the time of this offense.

[46] Given the nature of his offenses and his character, we are not persuaded that Williams's sentence is inappropriate.

# Conclusion

[47] Williams knowingly, voluntarily, and intelligently waived his right to a jury trial, and the trial court did not abuse its discretion by admitting evidence obtained pursuant to Hempel's consent. Williams's convictions do not violate double jeopardy principles because each offense requires proof of additional facts which the other does not, and each was established by separate and distinct facts. Finally, the trial court did not abuse its discretion in sentencing, and an aggregate sentence of nineteen years is not inappropriate. Therefore, we affirm.

[48] Affirmed.

Bailey, J., and Brown, J., concur.