**Cory HEINZMAN, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 29A04–0710–CR–553.**

Court of Appeals of Indiana.

Oct. 31, 2008.

---

Andrew M. Barker, Stephenie K. Goo-kins, Campbell Kyle Proffitt LLP, Nobles-ville, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Joby D. Jerrells, Deputy Attor-ney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

MAY, Judge.

Cory Heinzman, a Child Protective Ser-vices caseworker with the Indiana Family and Social Services Administration (FSSA), was convicted after a jury trial of sixteen counts including official misconduct and various sexual offenses involving mi-nors. He argues on appeal his charges should have been severed for trial, the State did not establish venue with regard to one victim, and there was insufficient evidence of official misconduct. We affirm in part, reverse in part, and remand.

**FACTS AND PROCEDURAL HISTORY**

Heinzman was employed in Hamilton County as a Child Protective Services (CPS) caseworker. In August of 2003, Heinzman met R.S., then thirteen years old, when he was assigned to investigate R.S.'s allegation his mother had abused him. Heinzman went to the family home, where R.S. recanted the allegation and Heinzman spoke with R.S.'s mother. Heinzman returned to the home the fol-lowing week and left some Wal–Mart gift cards to be used for food and clothing.

R.S. was sent to a residential treatment facility. Heinzman wrote to R.S. and sent him gifts while he was there. On several occasions beginning a few weeks after R.S. returned home, Heinzman drove R.S. vari-ous places and took R.S. to a movie, on which occasions he touched R.S. inappro-priately. Heinzman bought movies for R.S., but R.S. had to perform oral sex on Heinzman to get the movies.

Heinzman met J.F., then fifteen, when J.F. was living in a residential treatment facility. He visited J.F. at one of the facilities, sent J.F. postcards, and ap-proved J.F.'s home visits. On some off-premises visits, lasting three or four hours, Heinzman drove J.F. around and touched him inappropriately in the car.

Heinzman was tried in a single proceed-ing in Hamilton County for the charges involving both victims.

**DISCUSSION AND DECISION**

1. *Severance*

Ind.Code § 35–34–1–9(a) provides:

Two (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:

(1) are of the same or similar charac-ter, even if not part of a single scheme or plan; or

(2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

Under Ind.Code § 35–34–1–11(a),

Whenever two (2) or more offenses have been joined for trial in the same indict-ment or information solely on the ground that they. are of the same or similar character, the defendant shall have a right to a severance of the of-fenses. In all other cases the court,

upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:

(1) the number of offenses charged;

(2) the complexity of the evidence to be offered; and

(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

■ Accordingly, severance is required as a matter of right under subsection 11(a) only when the offenses are joined solely because they are of the same or similar character. *Ben-Yisrayl v. State*, 690 N.E.2d 1141, 1145 (Ind.1997). When the offenses are joined under subsection 9(a)(2), the court must grant a severance only if it is appropriate to promote a fair determination of the defendant's guilt or innocence based on subsections 11(a)(1) through (3). *Id.* Unless the defendant is entitled to severance as a matter of right under Ind.Code § 35–34–1–11(a), whether to sever multiple charges is a matter within the trial court's discretion and a denial of severance will be reversed only on a showing of clear error. *Davidson v. State*, 558 N.E.2d 1077, 1083 (Ind.1990).

■ Charges may be sufficiently connected as a "single scheme or plan" to justify joinder if the State can establish they are connected by a distinctive nature, a common *modus operandi* linked the crimes, and the same motive induced the criminal behavior. *Wilkerson v. State*, 728 N.E.2d 239, 246 (Ind.Ct.App.2000). "*Modus operandi*" means "method of working," and refers to a pattern of criminal behavior so distinctive that separate crimes may be recognized as the work of the same wrongdoer. *Id.* Mere repetition of similar crimes does not by itself warrant

admission of the evidence of those crimes under the *modus operandi* rule; the inquiry must be whether the crimes are "so strikingly similar that one can say with reasonable certainty that one and the same person committed them." *Id.* Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways that attribute the crimes to one person. *Id.*

In *Wilkerson*, we noted the inherent similarities in all sex crimes, the common use of disguises, and the frequent late night or early morning timing of residential intrusions. We accordingly did not find Wilkerson's attacks revealed a distinctive *modus operandi* as the connection between the two crimes was limited:

Both are sex crimes that occurred in Anderson, Indiana; however, they occurred three weeks apart, at different times of the day, at different locations, to different victims. Further, different weapons were used and one victim was robbed while the other was not. The assault on T.S. occurred on July 8, 1985, at 1:00 a.m. She awoke to find a man straddling her with scissors at her throat. He had entered her apartment through a window and was wearing nothing except a shirt covering his face. He forced her to submit to oral sex followed by sexual intercourse. He then demanded money and emptied her purse taking a cigarette, a cigarette lighter, money, and some food stamps. T.S. was unable to identify her attacker. The assault on A.W. occurred at approximately 10:30 p.m. on July 25, 1985. The man broke in thru [sic] a window, grabbed her, and forced her to submit to intercourse and oral sex. During the attack, Wilkerson was dressed and held a switchblade to her neck. Also, A.W. had seen Wilkerson on two occasions prior to the attack, and on one occasion

he offered her $100 to have intercourse. A.W. identified Wilkerson as the man who raped her.

*Id.* at 247.

We found the charges were joined because the offenses were of "the same or similar character" and if Wilkerson had moved to sever the charges, the trial court would not have had discretion to deny the motion. Wilkerson was prejudiced by his counsel's unexplained failure to move for severance of the charges because it permitted the trial court to impose consecutive rather than concurrent sentences. *Id.* at 246.

In *Ben–Yisrayl,* 690 N.E.2d at 1145, our Supreme Court found Ben–Yisrayl's crimes had the same *modus operandi.* Both shootings involved victims who were clerks and were killed at their place of business while working alone between the hours of 6:00 p.m. and 8:00 p.m. The assailant in both shootings was identified as someone who drove a white Nissan Sentra automobile. In both killings, the victims' cash registers were emptied. The cause of death for both victims was a shotgun blast to the head, at close range, from a. 12 gauge shotgun. Winchester AA 8 shotgun waddings were also found at both crime scenes. The shootings were committed in Portage, two days apart. The crimes had the same motive, robbery. Those facts were sufficient to show a "series of acts connected together," so the offenses were not joined solely because they were of "same or similar character" and severance was therefore not mandated as a matter of right. *Id.* at 1146.

■ Heinzman's offenses were not joined "solely because they are of the same or similar character." Rather, they were joined on the State's theory Heinzman "abused his position as a caseworker to perpetuate his child molesting scheme." (Br. of Appellee at 6.) Heinzman met both victims through his employment with CPS. He sent letters or cards to both victims while they were in residential facilities and bought trinkets for both. He molested both by fondling them while taking them on drives. He took both victims to Dave's Video, where he bought both victims movies or video games. We cannot say the trial court erred to the extent it determined a common *modus operandi* linked the crimes and that the same motive induced the criminal behavior.

■ As Heinzman was not entitled to severance as a matter of right, whether to sever the multiple charges was within the trial court's discretion and we will reverse its decision only on a showing of clear error. The trial court must determine whether severance is appropriate to promote a fair determination of a defendant's guilt or innocence of each offense. *Piercefield v. State,* 877 N.E.2d 1213, 1218 (Ind. Ct.App.2007). In making such a determination, the trial court must consider the number of offenses charged, the complexity of the evidence to be offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense. *Id.*

In *Piercefield,* there were three molestation victims. Only three offenses were charged in eight counts. The evidence was not complex and consisted primarily of the children's testimony. The jury "clearly had no problem in distinguishing the evidence as to each alleged offense and considering the charges separately," because it acquitted Piercefield of the charge involving one victim. *Id.* We found the trial court did not abuse its discretion in denying Piercefield's motion for severance. *Id.*

Heinzman was charged in twenty-nine various counts with at least five offenses, even though there were only two victims.

This suggests the trial should have been severed. We agree with Heinzman that "the sheer volume of the charges ... made it difficult for the jury to distinguish the evidence and apply the law intelligently to each offense." (Appellant's Br. at 17.) But it appears the jury was able to do so. As in *Piercefield*, the evidence consisted primarily of the children's testimony, and the jury found Heinzman not guilty of four counts. Despite the "sheer volume" of the charges the State brought against Heinzman, we cannot find clear error in the trial court's decision not to sever the trials.

### 2. *Venue*

Heinzman was tried in Hamilton County and argues four counts involving J.F. should have been dismissed because the State did not establish any connection to Hamilton County. As Heinzman drove from Hamilton County to gain access to J.F. and communicated with J.F. from Hamilton County in furtherance of his offenses, venue in that county was proper.

 The right to be tried in the county where an offense was committed is a constitutional and a statutory right. *Alkhalidi v. State*, 753 N.E.2d 625, 628 (Ind.2001). Venue is not an element of the offense. *Id.* Accordingly, although the State is required to prove venue, it may be established by a preponderance of the evidence and need not be proved beyond a reasonable doubt. *Id.* Where it cannot readily be determined in which county an offense was committed, trial may be held in any county where an act was committed in furtherance of the offense. *Eckstein v. State*, 839 N.E.2d 232, 233 (Ind.Ct.App. 2005).

In *Cutter v. State*, 725 N.E.2d 401 (Ind. 2000), Cutter was tried in Marion County. It was "wholly speculative" where Cutter

killed his victim, *id.* at 410, but witnesses testified they saw Cutter and the victim talking and dancing at a bar in Marion County a few days before she was found dead in Delaware County. Cutter was seen leaving the bar with the victim and helping her into his car. That evidence was sufficient to prove venue in Marion County. *Id.*

 In the case before us, there was no evidence where Heinzman molested J.F., but his travel vouchers show he drove from Hamilton County, where he worked, to Delaware County, where J.F. was residing, on some of the days when J.F. was molested. That evidence could establish venue in Hamilton County.

Heinzman also communicated with J.F. from Hamilton County. In *Laughner v. State*, 769 N.E.2d 1147, 1157 (Ind.Ct.App. 2002), *reh'g denied, trans. denied* 783 N.E.2d 701 (Ind.2002), *cert. denied* 538 U.S. 1013, 123 S.Ct. 1929, 155 L.Ed.2d 849 (2003), we found venue proper in Vanderburgh County when the offense that resulted in Laughner's child solicitation charge was his act of typing a message into his computer in Marion County and sending it to a recipient in Vanderburgh County. We relied on *Wurster v. State*, 715 N.E.2d 341, 350 (Ind.1999), where our Supreme Court found sending a tax return from one county to a second county for processing was analogous to firing a gun across a county line. "The offense is committed in both the county where the shooting starts and the county where the victim is hit." *Id.* For purposes of venue, it found the critical fact in such a scenario to be whether the defendant took any "action directed at" the second county. *Id.* Laughner's computer message, we held, was "action directed at" Vanderburgh County.[1] 769 N.E.2d at 1157. Because

---

**1.** We noted there were other facts that showed action directed at Vanderburgh Coun-

the charge involved action taken by him directed at Vanderburgh County, that county was a proper venue for his trial.

It could not readily be determined in which county the offenses against J.F. were committed, as his visits with Heinzman that involved criminal acts did not take place at Heinzman's office and J.F. did not know what county they were in when Heinzman was driving him to various locations. There was evidence, however, that Heinzman drove from Hamilton County to meet J.F. and he contacted J.F. from Hamilton County while J.F. was at the Youth Opportunity Center in Delaware County. Heinzman sent J.F. a number of postcards from April 2004 to March 2005. Heinzman was employed in Hamilton County as J.F.'s caseworker and had significant authority over J.F. *See Cutter,* 725 N.E.2d at 410 (as a matter of law, a step that "may itself have been innocent, but nonetheless in furtherance of the crime, satisfied the State's burden of proving venue by a preponderance of the evidence."). The State established by a preponderance of the evidence that some acts in furtherance of Heinzman's offense took place in Hamilton County, and venue there was not error.

### 3. *Sufficiency of Evidence of Official Misconduct*

 Heinzman was convicted of eight counts of official misconduct, six of which involved R. S.[2] There was insufficient evidence to support those convictions because Heinzman's offenses were not committed in the course of his official duties.

 A public servant who knowingly or intentionally performs an act the public servant is forbidden by law to perform commits official misconduct, a Class D felony. Ind.Code § 35–44–1–2. The statutory language is broad and general, but "the heart of the issue in an official misconduct charge is explicit: whether the act was done by a public official in the course of his official duties." *State v. Dugan,* 793 N.E.2d 1034, 1039 (Ind.2003). There must be a connection between the charge and the duties of the office. *Id.* A charge for misconduct must rest on criminal behavior related to the performance of official duties. *Id.* If the misconduct bears no relation to the official duties, there is no official misconduct. *Id.*

The State offers only the following argument regarding the official misconduct counts: "[Heinzman] seems to argue that because he committed his crimes 'on his own time' he is released from liability for official misconduct. [Heinzman] committed child molesting and sexual misconduct against the very children he was supposed to protect. Defendant abused his office and office resources to perpetuate his crimes." (Br. of Appellee at 10–11.)

The State has not provided cogent argument supported by legal authority explaining why Heinzman's actions after he no longer had an open case file on R.S. and was no longer acting in any official capacity towards R.S. amounted to "criminal behavior *related to the performance of offi-*

---

ty: Laughner "(1) arranged a meeting in Evansville in furtherance of the attempt that was the subject of the conversation, and (2) did immediately travel to that county." 769 N.E.2d at 1157.

**2.** Heinzman does not appear to be challenging the convictions of official misconduct involving J.F. The State asserts Heinzman

"challenges only the sufficiency of his convictions for [sic] Counts 26 and 28, regarding R.S. only." (Br. of Appellee at 10.) The pages of the record and Heinzman's brief to which the State directs us do not support that characterization of Heinzman's argument, and Counts 26 and 28 include no allegations regarding R.S.

*cial duties," Dugan,* 793 N.E.2d at 1039 (emphasis supplied). Heinzman accordingly needs show only *prima facie* error. *See Bright v. Kuehl,* 650 N.E.2d 311, 314 n. 3 (Ind.Ct.App.1995) (party's failure to provide citation to authority "is akin to failure to file a brief, and subjects the appellee to reversal upon the appellant's showing of *prima facie* error").

Heinzman has shown *prima facie* error.[3] We addressed the requisite connection between criminal activity and official duties in *State v. Lindsay,* 862 N.E.2d 314 (Ind. Ct.App.2007). Lindsay was a former Brazil, Indiana police officer who left the department in 1990 and moved away. While he was a Brazil police officer Lindsay investigated a double homicide that occurred in 1988. When he left in 1990, the case was unsolved. In 2003, the Indiana State Police began re-investigating the 1988 murders. Three witnesses, who had apparently provided statements during the original investigation, recanted their statements. The cold case team shifted its focus to Lindsay after receiving information the witnesses' statements during the original investigation may have been procured by Lindsay's threats and intimidation.

The cold case team asked Lindsay to return to Indiana to assist with the investigation of the 1988 murders. A grand jury returned an indictment charging Lindsay with one count of corrupt business influence and two counts of false informing. Lindsay moved to dismiss the indictment, claiming, among other things, the five-year statute of limitation had run for the corrupt business influence charge. The trial court agreed and dismissed that charge.

In what we called "an attempt to demonstrate that the pattern of racketeering activity continued into 2003 and 2004," the State "recharacterize[d] the conduct giving rise to the false informing charges as official misconduct." *Id.* at 319. We determined the conduct giving rise to the false informing charges, *i.e.* Lindsay's alleged false statements in 2003–2004 concerning the 1988 murders, were not related to Lindsay's "performance of his official duties as a federal police officer working in the State of Florida for the Department of Veterans Affairs.... The State cannot avoid application of the statute of limitation by simply recharacterizing conduct as an offense which it is not." *Id.* at 319.

Heinzman directs us to evidence none of the offenses involving R.S. occurred while Heinzman was acting as R.S.'s case manager. Heinzman was involved with R.S.'s family in his official capacity for "[n]ot longer than a week," and devoted "[a]bout 10 to 15 hours" to the family in his official capacity. (Tr. at 932.) The only contact Heinzman had with R.S. during that time was an initial visit to R.S.'s home after R.S. made allegations of abuse against his mother and a return visit to deliver some gift cards CPS had purchased. The State directs us to no contrary evidence.[4]

---

**3.** Because we agree Heinzman made a *prima facie* case there was insufficient evidence of official misconduct as to R.S., we need not address his argument the jury should have been instructed such misconduct must be a criminal act committed "during the course of [Heinzman's] official duties." (App. at 265.)

**4.** In her dissent, Judge Vaidik correctly notes evidence in the record suggesting Heinzman continued working with R.S.'s family "in a manner related to his CPS employment throughout the duration of his interactions with R.S.[,]" which evidence would indicate his "continued interactions with R.S. were related to his official duties." The dissent notes our "acceptance of Heinzman's statement that he worked on R.S.'s case for only a week in August 2003" and characterizes our reversal as an improper reweighing of the evidence.

But that is not the basis on which we reverse the official misconduct convictions. As explained above, the State offered no cogent

Heinzman has established *prima facie* error in his convictions of official misconduct regarding R.S., as there was no evidence Heinzman was performing any "official duties" when the offenses against R.S. were committed. We accordingly reverse those convictions.

## CONCLUSION

We reverse Heinzman's convictions of official misconduct involving R.S., and remand with instructions to vacate those convictions, and affirm in all other respects.

Affirmed in part, reversed in part, and remanded.

MATHIAS, J., concurring.

VAIDIK, J., dissenting with opinion.

VAIDIK, Judge, dissenting.

I respectfully dissent from the majority's reversal of Heinzman's convictions for official misconduct relating to his offenses against R.S. Because I believe that the evidence is sufficient to support Heinzman's convictions, I would affirm.

The majority correctly restates the law regarding the requisite connection between the behavior underlying an official misconduct charge and the defendant's official duties: "There must be a connection between the charge and the duties of the office. A charge for misconduct must rest upon criminal behavior that is related to the performance of official duties." *State v. Dugan*, 793 N.E.2d 1034, 1039 (Ind. 2003). I certainly agree with the majority that if the defendant's charged conduct bears no relation to his official duties then

he cannot be convicted of official misconduct. *See id.* ("Needless to say, if the misconduct bears no relation to the official duties, there is no official misconduct."). However, I depart from my colleagues on the question of whether Heinzman's crimes against R.S. relate to the performance of his official duties.

Heinzman contended at trial and again now on appeal that he worked with R.S.'s family in his capacity as a CPS worker for "[n]ot longer than a week" in August 2003, Tr. p. 932, and that this official relationship ended before the molestations occurred. Appellant's Br. p. 25. At the time when Heinzman met R.S. and throughout the period of molestation, Heinzman was a Child Protective Services family case manager for the Department of Family and Children.[5] Ex. p. 81. He initially visited R.S.'s home after R.S. made an allegation while at school that his mother hit him. Tr. p. 385–86. During this home visit, R.S. informed Heinzman that he had lied about the abuse. *Id.* at 387. Nonetheless, Heinzman met with R.S. and members of his extended family for two to three hours and took photographs of bruises on R.S.'s legs. *Id.* at 386, 542. R.S.'s mother, Andrea, testified at trial that Heinzman then asked the family what services he could provide for them: "He talked to us about, asked us if we needed, if our family needed anything, if we needed any services, what could he do for us." *Id.* at 542. Andrea replied, "I told him ... that [R.S.] needed ... a Big Brother from the Big Brother/Big Sister program because Hamilton County had a waiting list and that ... we

argument supported by legal authority explaining why Heinzman's actions amounted to criminal behavior related to the performance of his official duties. "In such a situation, the reviewing court does not undertake the burden of developing arguments for the

appellee." *White v. Porter County Treasurer*, 671 N.E.2d 1196, 1197 (Ind.Ct.App.1996).

5. Child Protective Services later became a part of the Department of Child Services when that department was statutorily created.

could use clothes and food and, because [R.S.] was getting bigger." *Id.* at 543.

In response to Andrea's request—which, again, came directly in response to Heinzman's offer to provide services—Heinzman returned to the family's home the following week with $300 to $400 worth of Wal–Mart gift cards for clothes and food. *Id.* at 544. During one of these two initial visits, he also instructed Andrea to call him at his office if she had trouble with R.S. *Id.* at 545. She soon did so, and Heinzman told her to bring R.S. to his office. *Id.* R.S. then began seeing Heinzman in his office regularly, as Heinzman admitted at trial. *Id.* at 934; *see also id.* at 545–47. Heinzman also admits in his appellate brief that he helped the family become involved with the Center for Mental Health beginning in September 2003. Appellant's Br. p. 4. Andrea explained at trial that the Center for Mental Health was "[a] place where [R.S.] could see a psychiatrist, for his medications, and go to therapy." Tr. p. 547. Heinzman further admits that he later attended a planning council meeting for R.S., and this meeting took place in November 2003. *Id.* at 933; *see also* Ex. p. 85 (Heinzman's handwritten note regarding the date and time of R.S.'s planning council meeting). Heinzman later began taking R.S. on outings with Andrea's permission. It was during these outings that the molestations occurred.

Heinzman was ultimately convicted of multiple counts of official misconduct for sex offenses committed against R.S. between August 4, 2004, and March 3, 2005. The majority reverses these convictions because it finds that the evidence does not show that he officially worked on R.S.'s CPS case beyond a one-week time period in August 2003. Op. p. 724. Preliminarily, it is noteworthy that Heinzman's compensatory time worksheets maintained for his employer, which were entered into evidence at trial and emphasized by the State during closing arguments, show that Heinzman logged official time on R.S.'s CPS case as late as April 16, 2004—in direct contradiction to Heinzman's trial testimony that the case was closed in August 2003. Ex. p. 82; Tr. p. 932–33. Beyond this, however, it is also clear that the jury believed that Heinzman continued working with R.S.'s family in a manner related to his CPS employment throughout the duration of his interactions with R.S. First, the compensatory time worksheet evidences that Heinzman's characterization of his relationship with R.S. after August 2003 as personal rather than official is blatantly dishonest. More telling, though, is Heinzman's own characterization of his services to R.S. In Heinzman's estimation, "[b]etween August 2003 and April 2005, [he] had contact with R.S.'s mother regarding R.S., arranging visits and *checking on his needs* over a hundred times." Appellant's Br. p. 5 (emphasis added) (citing Tr. p. 600). This service—checking on R.S.'s needs—is directly in line with Heinzman's official responsibilities as a CPS family case manager. A job description for a CPS family case manager was admitted without objection at trial and reflects that Heinzman had the following official duties:

- Investigate[ ] reported incidents of child abuse, neglect, make[ ] a determination of whether or not the incident is substantiated and develop[ ] recommendations to a Juvenile Court for disposition.

> \* \* \* \* \* \*

- Perform[ ] *needs assessments* to determine treatment options for families and children.

> \* \* \* \* \* \*

- Maintain[ ] case files and develop[ ] briefing reports for the community child

protection team, in-office case staffing or out-of-home placement agency staffing.

• Develop[ ] plans with families and children in their home to divert children from the juvenile justice system.

• Develop[ ] case plans to assist families and children to become more self-sufficient in a safe and nurturing environment and to assure a permanent home for the child.

Ex. p. 81 (emphasis added). The purpose of his official duties was "to protect children from abuse and neglect and either maintain or reunify families whenever possible." *Id.* Thus, even assuming that Heinzman is telling the truth that he closed R.S.'s CPS file before the molestations occurred,[6] by persisting in checking on R.S.'s needs and interacting with his family, Heinzman's continued interactions with R.S. were related to his official duties. *See Dugan,* 793 N.E.2d at 1039.

The majority concludes that the evidence does not reflect actions undertaken by Heinzman that are related to his duties as a CPS family case manager. This, however, is based upon its acceptance of Heinzman's statement that he worked on R.S.'s case for only a week in August 2003. Op. p. 724. In contrast, the jury was presented with the aforementioned evidence that Heinzman continued to perform services related to his initial meetings with R.S.'s family long after Heinzman contends his role as a CPS family case manager ended with the family. The only evidence I have located in the record to the contrary is Heinzman's self-serving testimony that he dedicated a mere ten to fifteen hours to officially working for R.S. and his family over the course of a week. Tr. p. 932–33. The jury heard the conflicting evidence on this point, and the State and the defense argued this issue during closing arguments. *Id.* at 1034–1036 (State argues the point and ends, "You will have to decide who to believe."); 1062–63 (defense argument). The jury then judged the credibility of the witnesses, ultimately disbelieving Heinzman. I believe that the majority has improperly reweighed the evidence in reaching its result. I would therefore affirm Heinzman's convictions for official misconduct relating to his offenses against R.S.

---

**6.** In his appellate brief, Heinzman directs us to no documentation in the record other than his own testimony that the file was, in fact, closed.