## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Bruce W. Graham
Graham Law Firm P.C.
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Eric D. Lacy, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 21, 2015 <br><br> Court of Appeals Case No. 79A05-1412-CR-590 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Randy J. Williams, Judge <br><br> Trial Court Cause No. 79D01-1310-FB-28 |

**Kirsch, Judge.**

Eric D. Lacy was convicted after a jury trial of possession of methamphetamine[1] as a Class B felony, auto theft[2] as a Class D felony, illegal drug lab[3] as a Class C felony, possession of a schedule IV controlled substance[4] as a Class C felony, possession of a syringe[5] as a Class D felony, possession of paraphernalia[6] as a Class A misdemeanor, conspiracy to commit burglary[7] as a Class B felony, conspiracy to commit theft[8] as a Class D felony, burglary[9] as a Class C felony, and two counts of theft,[10] each as a Class D felony, and was adjudicated a habitual offender.[11] He appeals raising the following restated issues for our review:

> I. Whether the trial court abused its discretion in admitting evidence discovered in violation of the Fourth Amendment to the

---

[1] *See* Ind. Code § 35-48-4-6.1.  We note that, effective July 1, 2014, a new version of these criminal statutes was enacted.  Because Lacy committed his crimes prior to July 1, 2014, we will apply the statutes in effect at the time he committed his crimes.

[2] *See* Ind. Code § 35-43-4-2.5.

[3] *See* Ind. Code § 35-48-4-14.5.

[4] *See* Ind. Code § 35-48-4-7.

[5] *See* Ind. Code § 16-42-19-18.

[6] *See* Ind. Code § 35-48-4-8.3.

[7] *See* Ind. Code §§ 35-41-5-2, 35-43-2-1.

[8] *See* Ind. Code §§ 35-41-5-2, 35-43-4-2.

[9] *See* Ind. Code § 35-43-2-1.

[10] *See* Ind. Code § 35-43-4-2.

[11] *See* Ind. Code § 35-50-2-8.

United States Constitution and Article 1, section 11 of the
Indiana Constitution;

II. Whether the trial court abused its discretion when it denied
Lacy's motion to sever the charges for trial;

III. Whether sufficient evidence was presented to support Lacy's
conviction for possession of a syringe; and

IV. Whether the trial court erred in allowing the State to amend
the habitual offender charging information.

[2]     We affirm in part and reverse in part.

## Facts and Procedural History

[3]     On October 7, 2013, Lafayette Police Department Officer John Wells ("Officer
Wells") responded to a report of an auto theft at St. Elizabeth Hospital in
Lafayette, Indiana. Officer Wells spoke with Nancy Billue ("Billue"), who was
visiting her fiancé at the hospital and had driven his red Ford Focus and parked
it in the hospital parking garage. Billue had fallen asleep in the visiting area,
and when she woke up, she realized that her jacket and the car keys had been
taken. Billue went to the parking garage and discovered that the Ford Focus
had been stolen. After speaking with Billue, Officer Wells spoke with the
hospital security staff, who reviewed the video surveillance footage showing
two individuals, later identified as Lacy and Leslie Carr ("Carr"), entering the
hospital and checking the clothing of people who were sleeping in the hospital's
common areas. With the assistance of hospital security, Officer Wells

recovered two bicycles that had been abandoned in the bushes near one of the hospital's entrances. Officer Wells entered information about the Ford Focus into the computer databases as a stolen vehicle.

[4] A few days later, Lacy came into contact with Brian Williamson ("Williamson"), whom Lacy had met when both men were incarcerated in the Fountain County Jail. Lacy asked if he and Carr could stay in Williamson's apartment for a couple of days. The apartment was located at 1723 Greenbush Street in Lafayette and was within 1,000 feet of St. Lawrence School, Linwood Elementary School, and Linwood Park. Williamson rented the apartment from ERE Lafayette, LLC ("ERE") under a lease that prohibited him from allowing other people to occupy the apartment or altering the premises. *State's Ex.* 39. Williamson had moved out of the apartment and told Lacy that he and Carr could stay at the apartment for a couple of days.

[5] After allowing them to stay at his apartment, Williamson noticed that Lacy and Carr were moving all of their property into the apartment and that they had changed the locks on the apartment. At that point, Williamson wanted them to leave, but did not know how to get them out of the apartment because they appeared "dead set on them not leaving." *Tr.* at 225. Although Williamson was no longer living in the apartment primarily, he continued to keep some personal property there, including a moped, a television, a dresser, and some tools. Williamson also visited the apartment while Lacy and Carr were living there to smoke methamphetamine. Williamson observed Lacy and Carr driving a red Ford Focus and rode with Lacy occasionally.

[6] Both Lacy and Carr were methamphetamine users and manufacturers. They used the Ford Focus to drive to stores to obtain the ingredients and supplies needed to manufacture methamphetamine, and they also drove the car to rural locations in Tippecanoe County to manufacture methamphetamine outdoors. Lacy and Carr needed money to buy methamphetamine or the ingredients and supplies necessary to manufacture it.

[7] In the beginning of October, Carr contacted Jason Martin ("Martin"), with whom she had previously lived for several years in his home on Stair Road in Tippecanoe County. Although they had separated in 2007, Martin still had the same employment and work schedule as when he lived with Carr. On October 10, 2013, Martin returned home from work and found his shed had been broken into by cutting the lock Martin kept on the door. Several tools were stolen from the shed, including a router, router bits, a jigsaw, and a circular saw; a generator was also stolen from the shed. Martin contacted the Tippecanoe County Sheriff's Department, and a deputy came to take a report of the burglary.

[8] On October 15, 2013, Martin returned home from work and found his home had been broken into by shoving the door with such force that the door frame was dislodged. The home was ransacked inside, and many items were stolen, including two guitars, amplifiers, a television, two computers, and jewelry. Martin noticed that some photographs had been pulled out of a cabinet, particularly photographs of a cat that had been purchased when he and Carr were living together. Martin reported this burglary to the Sheriff's Department,

and based on the photographs, he told the police that he suspected Carr of being involved in the burglary.

[9] On the morning of October 18, 2013, Lafayette Police Department Officer Thomas Davidson ("Officer Davidson") was on routine patrol when he received a dispatch of an anonymous report that Lacy and Carr were driving a stolen red Ford Focus in the area of 18th Avenue and Greenbush Street in Lafayette. Officer Davidson and several other officers went to the location. There, Officer Davidson saw a female in a red Ford Focus at 1723 Greenbush Street. Officer Davidson observed that the female's appearance matched the description of Carr in the computer system. Carr had parked the Ford Focus and turned off the motor. Officer Davidson approached the car and asked Carr for her name. After Carr identified herself by name and date of birth, Officer Davidson had her step out of the car. When she did so, Officer Davidson noticed Carr had a glass pipe between her legs. Officer Davidson then performed a pat down on Carr and handcuffed her. He also took the keys in Carr's possession.

[10] Although the license plate number listed for the Ford Focus did not match the plate number on the car, the vehicle identification number matched that of the Ford Focus stolen from Billue on October 7. Officer Davidson observed that the car was filled with several items including a television and several guitars. Officer Thomas Bordenet ("Officer Bordenet") and Officer Stephen Pierce ("Officer Pierce") of the Lafayette Police Department also arrived at the scene and determined that the vehicle registration for the car was registered to Billue's

fiancé, Richard Snyder. Carr told the officers that she and Lacy lived in Apartment 1 at 1723 Greenbush Street and that Lacy was asleep inside the apartment. Officer Pierce knocked on the door of the apartment, but there was no answer.

[11] About an hour and a half after the police encountered Carr in the Ford Focus, a neighbor called Karrie Moore ("Moore"), the property manager for ERE, and informed her that the police were at the Greenbush Street apartments. Moore took the master keys to the apartments and drove over to the address. When she arrived, she saw the officers standing near the Ford Focus behind the apartment. Moore approached the officers, introduced herself as the property manager, and informed the officers that Williamson was the tenant of Apartment 1 and not Lacy and Carr. The officers had Moore look at Carr to see if Moore could recognize her as the tenant, but Moore could not. Moore called the owner of the building, and he told Moore that he wanted Lacy and Carr escorted out of the apartment as they were not on the lease. Moore told Officer Pierce that Carr's key to the apartment should be turned over to Moore since Carr was not on the lease, and the officer retrieved the key and gave it to Moore.

[12] Moore asked the officers what she could do to remove Lacy and Carr from the apartment. They told her they could not enter the apartment without a warrant, but that, as the property manager, she could enter the apartment. Moore, accompanied by Officers Davidson, Bordenet, and Pierce, went to the apartment's door and knocked and shouted "management." *Tr*. at 248. She

tried to enter with the master key, but it did not work, so she tried the key she had received from Officer Pierce that had been taken from Carr. Moore was able to unlock the door with this key, and after opening the door, she took one or two steps into the apartment and shouted, "management." *Id*. The officers stayed outside on the porch and did not enter the apartment. Moore heard someone moving around who said that he would be there in a minute. Moore stepped back outside the apartment at that time.

[13] Lacy came to the door and exited the apartment. Williamson was called to the apartment and arrived shortly thereafter. Officer Bordenet presented Williamson with a consent to search form and requested permission to search the apartment. Williamson signed the form and gave his consent to search the apartment. Lacy was also presented with a consent to search form, which he also signed and gave his consent to search the apartment. Inside the apartment, officers found lithium batteries, a digital scale, coffee filters, organic solvents, glass mason jars, and lighter fluid, which are all used in the manufacture of methamphetamine. They also found a pill grinder, drain cleaner containing lye or sodium hydroxide, more lye and sulfuric acid, cold packs containing ammonium nitrite, and plastic tubing consistent with use in an HCL generator, all of which are also used in the manufacture of methamphetamine. After conducting a search of the Ford Focus, the officers found, inside the car, a respirator and lithium batteries.

[14] The State initially charged Lacy with Count I, Class B felony possession of methamphetamine and Count II, Class D felony auto theft. The State later

added Count III, Class C felony illegal drug lab, Count IV, Class C felony possession of a schedule IV controlled substance, Count V, Class D felony possession of a syringe, Count VI, Class A misdemeanor possession of paraphernalia, Count VII, Class B felony conspiracy to commit burglary, Count VIII, Class D felony conspiracy to commit theft, Count IX, Class C felony burglary, Count X, Class D felony theft, Count XI, Class B felony burglary, and Count XII, Class D felony theft. The State later filed Count XIII, alleging Lacy to be a habitual offender.

[15]     The State amended the habitual offender count on two separate occasions. Lacy filed a motion to suppress and a request for severance of the offenses, and the trial court denied both motions. A jury found Lacy guilty of all the charges except for burglary as a Class B felony. Lacy waived his right to a jury trial on the habitual offender allegations, and the trial court found him to be a habitual offender. The trial court imposed twenty-three years on the underlying offenses and enhanced his sentence for the Class B felony conspiracy to commit burglary being by ten years for the habitual offender finding, resulting in an aggregate sentence of thirty-three years, of which twenty-eight were ordered served in the Department of Correction, two years on community corrections, and three years suspended to probation. Lacy now appeals.

# Discussion and Decision

## I. Admission of Evidence

[16] Although Lacy originally challenged the admission of the evidence through a pre-trial motion to suppress, he appeals following a completed jury trial and thus challenges the admission of such evidence at trial. The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (citing *Farris v. State,* 818 N.E.2d 63, 67 (Ind. Ct. App. 2004), *trans. denied*). We will reverse a trial court's decision only for an abuse of discretion. *Id.* We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Id*. (citing *Taylor v. State,* 891 N.E.2d 155, 158 (Ind. Ct. App. 2008), *trans. denied*, *cert. denied* 555 U.S. 1142 (2009)). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.*

[17] Lacy argues that the trial court abused its discretion when it admitted evidence found inside the apartment without a warrant. He contends that the evidence was discovered in violation of the Fourth Amendment because his consent to search the apartment was not validly obtained. Lacy specifically asserts that, when Moore entered into the apartment, she was acting as an agent of the police and this illegal entry invalidated his consent. Lacy also claims that the evidence was found in violation of Article 1, section 11 of the Indiana Constitution because the actions of the police sending in an agent to do their

business imposed an unreasonable degree of intrusion. This, when balanced against the suspicion of the police that Lacy was involved in an auto theft and the insufficiently-demonstrated law enforcement needs when a warrant could have been sought, show that the actions of the police were unreasonable under the Indiana Constitution.

[18] The Fourth Amendment to the United States Constitution protects an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures. *Sugg v. State*, 991 N.E.2d 601, 607 (Ind. Ct. App. 2013) (citing *Washington v. State,* 922 N.E.2d 109, 111 (Ind. Ct. App. 2010)), *trans. denied*. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Id.* When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* The propriety of a warrantless search is subject to *de novo* review. *Montgomery v. State*, 904 N.E.2d 374, 378 (Ind. Ct. App. 2009) (citing *Engram v. State,* 893 N.E.2d 744, 748 (Ind. Ct. App. 2008), *trans. denied*), *trans. denied.*

[19] One recognized exception to the warrant requirement is a valid consent to search. *Bulthuis v. State*, 17 N.E.3d 378, 383 (Ind. Ct. App. 2014), *trans. denied*. "When an individual gives the State permission to search either his person or property, the governmental intrusion is presumably reasonable." *Id.* When relying upon consent to justify a warrantless search, the State bears the burden of proving that the consent was freely and voluntarily given. *Id.* The voluntariness of the consent to search is to be determined by considering the

totality of the circumstances. *Id.* A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law. *Crocker v. State,* 989 N.E.2d 812, 820 (Ind. Ct. App. 2013), *trans. denied.*

> The "totality of the circumstances" from which the voluntariness of a [defendant]'s consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his Miranda rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search.

[20] *Id.* at 820-21. "The determination of whether consent in this context was voluntary is a question of fact, and a reviewing court is ill-equipped to make factual determinations, especially where the evidence is conflicting." *Bulthuis,* 17 N.E.3d at 383.

[21] In the present case, after Lacy exited the apartment, he was provided with a written consent to search form, which was read to him by one of the officers. The form advised Lacy that he had a Constitutional right: (1) not to have a search conducted of the premises and vehicles under his control; (2) to refuse to consent to such a search; (3) to have an attorney appointed for him if he could not afford one; and (4) to consult with an attorney before deciding whether to

consent to the search. *State's Ex.* 28. After being read the consent form, Lacy consented to a search of the apartment. *Tr.* at 261-62. At the time that Lacy signed the consent form, there were several officers present in uniform and at least one detective in plain clothes, and the officers were not deceptive as to their identity or the purpose of the search. The reading and signing of the consent form occurred on the front porch of the apartment in the early afternoon at around 1:30 p.m. When the officers spoke to Lacy, they did not make any express or implied claim of authority to search without Lacy's consent. Nothing in the record suggested that Lacy was unable to understand the consent form, and the trial court was aware that Lacy had multiple prior encounters with law enforcement as he was facing allegations of being a habitual offender. We conclude that, based on the totality of the circumstances, the trial court did not abuse its discretion in determining that Lacy voluntarily consented to the search of the apartment.

[22] Further, Lacy alleges that, when Moore entered the apartment, her actions constituted an illegal police entry. We disagree. "Two 'critical factors' in the 'instrument or agent' analysis are (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private party's purpose in conducting the search was to assist law enforcement agents or to further its own ends." *Sweet v. State*, 10 N.E.3d 10, 14 (Ind. Ct. App. 2014) (citing *Bone v. State*, 771 N.E.2d 710, 714 (Ind. Ct. App. 2002)).

[23] Here, Moore's objective in entering the apartment was to fulfill her employer's request to escort Lacy out of the apartment because he was a squatter and not a

signatory on the lease. Moore asked the officers what she could do to remove Lacy and Carr from the apartment, and they informed her they could not enter the apartment without a warrant, but that, as the property manager, she could enter the apartment. Moore then entered the apartment to obey her employer's wishes, not to assist the police. Additionally, the police did not hand Carr's key to Moore unprompted to allow her entry to assist them. Moore had already previously told Officer Pierce that Carr's key to the apartment should be turned over to Moore since Carr was not on the lease, and the police were complying with that request. Although the police knew and acquiesced in Moore's entry into the apartment, the evidence failed to show that her purpose in entering the apartment was to assist law enforcement in their endeavors. Moore's entry into the apartment did not invalidate Lacy's consent to search the apartment. The trial court did not abuse its discretion in overruling Lacy's objection to the admission of the evidence based upon the Fourth Amendment.

[24] Lacy also argues that the trial court abused its discretion in admitting the evidence because the officers' actions violated the Indiana Constitution. Article I, Section 11 of the Indiana Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." Although virtually identical to the wording of the search and seizure provision in the federal constitution, Indiana's search and seizure clause is independently interpreted and applied. *Danner v. State*, 931 N.E.2d 421, 431 (Ind. Ct. App. 2010), *trans. denied*. Under the Indiana Constitution, the legality of a governmental search turns on an

evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Id*. (citing *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005)). The burden is on the State to show that under the totality of the circumstances, the intrusion was reasonable. *Id.* (citing *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004)). Generally, the reasonableness of a search or seizure under the Indiana Constitution turns on the balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* (citing *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[25] Lacy's argues that the police violated the Indiana Constitution by "massing" on the porch of the apartment and, "sending in an agent of the State to conduct their business," which tainted his consent. *Appellant's Br*. at 16. However, as we have previously discussed, Moore was not acting as an agent of the State when she entered the apartment; she was acting on the request of her employer to remove Lacy from the apartment. Therefore, Moore's entry into the apartment did not constitute an illegal entry that tainted Lacy's later valid consent to search. Searches do not violate the Indiana Constitution if voluntary consent to search is given. *Harper v. State*, 963 N.E.2d 653, 658 (Ind. Ct. App. 2012), *clarified on reh'g*, 968 N.E.2d 843 (Ind. Ct. App. 2012), *trans. denied*. The trial court did not abuse its discretion in overruling Lacy's objection to the admission of the evidence based upon Article 1, section 11 of the Indiana Constitution.

# II.  Severance of Offenses

[26]     Lacy contends that the trial court abused its discretion when it denied his motion to sever the offenses for trial because he claims the offenses did not constitute a single scheme or plan and could not be joined.  Indiana Code section 35-34-1-9(a) is the basis for joining these offenses and provides:

> Two (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:
>
> (1) are of the same or similar character, even if not part of a single scheme or plan; or
>
> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

However, Indiana Code section 35-34-1-11(a) provides for a right to severance of offenses that are joined solely on the ground that they are of the same or similar character:

> Whenever two (2) or more offenses have been joined for trial in the same indictment or information solely on the ground that they are of the same or similar character, the defendant shall have a right to a severance of the offenses.  In all other cases the court, upon motion of the defendant or the prosecutor, shall grant a severance of offenses whenever the court determines that severance is appropriate to promote a fair determination of the defendant's guilt or innocence of each offense considering:
>
> (1) the number of offenses charged;

(2) the complexity of the evidence to be offered; and

(3) whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

"Accordingly, severance is required as a matter of right . . . only when the offenses are joined solely because they are of the same or similar character." *Heinzman v. State*, 895 N.E.2d 716, 720 (Ind. Ct. App. 2008), *trans. denied*. Where the offenses have been joined because the defendant's underlying acts are connected together or constitute parts of a single scheme or plan, we review the trial court's decision on severance for an abuse of discretion. *Pierce v. State*, 29 N.E.3d 1258, 1264 (Ind. 2015).

[27] Lacy does not argue that he was entitled to severance as a matter of right on the basis that the charged offenses were joined together solely on the ground that they were of the same of similar character, and the issue is whether the charges were properly joined under Indiana Code section 35-34-1-9(a)(2) because they were based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan. "To determine whether offenses warrant joinder under subsection 9(a)(2), we ask whether the operative facts establish a pattern of activity beyond mere satisfaction of the statutory elements." *Pierce*, 29 N.E.3d at 1266.

[28] Here, the evidence showed that Lacy and Carr were methamphetamine users and manufacturers, who stole a car, and used that car to further their habit and to manufacture the drug. They drove the car to obtain the ingredients and

supplies necessary to make methamphetamine and to rural locations in Tippecanoe County to manufacture the drug. They also used the car to commit two burglaries at Martin's residence to steal items that they could sell to obtain money to make and buy more methamphetamine. Additionally, when Lacy and Carr were arrested, ingredients and supplies to manufacture methamphetamine and the drug itself were found in the car and the apartment where they were living. The common motive of making and buying methamphetamine and the continual use of the stolen vehicle to achieve this motive connected the crimes together and constituted a single scheme. The fact that Lacy's crimes were committed with Carr as a co-defendant is an additional fact linking the crimes. We conclude that Lacy was not entitled to severance as a matter of right because his crimes were properly joined because they were based on a series of acts connected together or constituting parts of a single scheme or plan.

[29] Lacy contends that the trial court abused its discretion when it denied his motion to sever because severance was necessary to promote a fair determination of his guilt or innocence for each offense. In looking at the factors set out in Indiana Code section 35-34-1-11(a), we note that there were twelve offenses charged in this case. However, the evidence to be offered at trial was not complex and consisted of the testimony of the victims of the auto theft and burglaries, surveillance footage of the hospital showing Lacy and Carr checking the belongings of people, testimony of the actions and behaviors of Lacy and Carr near the time of the crimes, and the identification of items found

in the stolen car and the apartment where they were staying, including items stolen from Martin and items used in the manufacture and use of methamphetamine. Although Lacy was charged with several offenses, the jury was able to distinguish the evidence and apply the law to each offense. Indeed, the jury acquitted him of the Class B felony burglary charge. We do not find that the trial court abused its discretion when it denied Lacy's motion to sever his offenses for trial.

## III. Possession of a Syringe

[30] Lacy also argues that insufficient evidence was presented to support his conviction for Class D felony possession of a syringe under Indiana Code section 16-42-19-18. He contends that the statute prohibits the possession of a hypodermic needle or syringe with the intent to violate the Legend Drug Act and that there was no evidence presented that he intended to violate the Legend Drug Act in his possession of the syringe. Lacy asserts that the statute pertains only to legend drugs and not to controlled substances and methamphetamine in particular.

[31] The deferential standard of review for sufficiency claims is well settled. This court will neither reweigh the evidence nor assess the credibility of witnesses. *Tooley v. State*, 911 N.E.2d 721, 724 (Ind. Ct. App. 2009), *trans. denied*; *Elisea v. State*, 777 N.E.2d 46, 48 (Ind. Ct. App. 2002). Rather, we will consider only the evidence and reasonable inferences most favorable to the trial court's ruling. *Elisea*, 777 N.E.2d at 48. We will affirm unless no reasonable fact-finder could

find the elements of the crime proven beyond a reasonable doubt. *Tooley*, 911 N.E.2d at 724-25. Thus, if there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Trimble v. State*, 848 N.E.2d 278, 279 (Ind. 2006).

[32] Under Indiana Code section 16-42-19-18, which is entitled "legend drug injection devices," "[a] person may not possess or have under control with intent to violate this chapter a hypodermic syringe or needle or an instrument adapted for the use of a legend drug by injection in a human being." In order to be convicted under this statute, a defendant must possess a syringe with the intent to violate chapter 19, the Legend Drug Act, which is the chapter in which Indiana Code section 16-42-19-18 is included. Therefore, the requisite intent to be convicted under the statute is not expressed as the intent to inject any drug, but to violate the Act itself.

[33] In *Bookwalter v. State*, 22 N.E.3d 735 (Ind. Ct. App. 2014), *trans. denied*, a panel of this court construed this statute to determine whether possessing a syringe with the intent to inject heroin satisfied the intent element of Indiana Code section 16-42-19-18. *Id*. at 740. In that case, the defendant was found to possess a syringe and admitted that he intended to use it to inject heroin, but he argued that heroin was not a legend drug and that there was insufficient evidence to show he possessed the syringe with the intent to violate the Legend Drug Act. *Id*. at 739. This court found that the statute was ambiguous as to whether possession of a syringe with the intent to inject "any substance that is not also a legend drug, insulin, or anabolic steroid" was a criminal act under

Indiana Code section 16-42-19-18.[12]  *Id.* at 741.  Due to this ambiguity, this court applied the rule of lenity and construed the statute in favor of the defendant, concluding that intent to inject heroin was not covered by the Legend Drug Act's definition of the offense of possession of a syringe.  *Id.*

[34]  Applying this reasoning to the present case, we conclude that the evidence did not support Lacy's conviction for possession of a syringe.  The only evidence presented regarding the use of drugs with the syringe was associated with methamphetamine.  Methamphetamine is a schedule II controlled substance.  Ind. Code § 35-48-2-6(d).  A legend drug is defined as a drug listed in the "Prescription Drug Product List" as published and revised in "United Stated Department of Health and Human Services Approved Drug Products with Therapeutic Equivalence Evaluations" and its supplement.  Ind. Code § 16-18-2-199.  No evidence was presented that methamphetamine was a legend drug or that Lacy possessed the syringe with the intent to use a legend drug.  We, therefore, hold that the evidence did not establish that Lacy possessed a syringe with the intent to violate the Legend Drug Act, and his conviction for possession of a syringe as a Class D felony must be reversed.  Given that Lacy's sentence for his possession of a syringe conviction was ordered to be served

---

[12] We note that this ambiguity has been remedied by a change in the statutory language.  Effective July 1, 2015, Indiana Code section 16-42-19-18 was amended and now states, "A person may not possess with intent to:  (1) violate this chapter; or (2) commit an offense described in IC 35-48-4; a hypodermic syringe or needle or an instrument adapted for the use of a controlled substance or legend drug by injection in a human being."  Ind. Code § 16-42-19-18(a).  Indiana Code chapter 35-48-4 is entitled "Offenses Relating to Controlled Substances."  The statute is, therefore, no longer ambiguous as to its application to the possession of a syringe with the intent to inject a controlled substance.

concurrent with his six-year sentence for illegal drug lab and his one-year sentence for possession of paraphernalia, our decision to reverse his conviction does not affect his aggregate sentence. *See Appellant's App*. at 27-28.

## IV. Amendment of Charging Information

[35] Lacy asserts that the trial court erred in allowing the State to amend the habitual offender information on the day of the trial to reinstate the habitual offender count to its original form. He argues that the State did not show good cause for the late amendment, and the trial court abused its discretion in allowing it. Lacy further contends that he was prejudiced by the late amendment of the habitual offender information because his counsel "had to scramble at the last minute to review additional supporting documentation, and make decisions about whether or not Lacy could, or should[,] testify." *Appellant's Br*. at 25.

[36] Initially, we note that Lacy failed to request a continuance when the amendment was granted by the trial court. This court has held "a defendant's failure to request a continuance after a trial court allows a pre-trial substantive amendment to the charging information over defendant's objection results in waiver." *Wilson v. State*, 931 N.E.2d 914, 918 (Ind. Ct. App. 2010), *trans. denied*. Lacy had the opportunity to request a continuance of his trial for the purpose of allowing him the chance to prepare his defense after the trial court allowed the State to amend the charging information over his objection, but chose not to do so. "'A party may not sit idly by and permit the court to act in

a claimed erroneous matter and then attempt to take advantage of the alleged error at a later time.'" *White v. State*, 963 N.E.2d 511, 518 (Ind. 2012) (quoting *Hensley v. State,* 251 Ind. 633, 639, 244 N.E.2d 225, 228 (1969)). Lacy has, therefore, waived this issue for appellate review.

[37]     Waiver notwithstanding, Lacy's contention fails on the merits. Although he cites to Indiana Code section 35-41-1-5(e) and claims the State was required to show good cause before it could amend the habitual offender information, that subsection only applies when the State moves to amend the charging information to include or add a habitual offender charge; it does not apply when the State wishes to amend an existing habitual offender charge. *Williams v. State*, 735 N.E2d 785, 789 n.5 (Ind. 2000) (holding that it was erroneous for defendant to rely on Indiana Code section 35-34-1-5(e) where the State was requesting to amend the already existing habitual offender information); *Haymaker v. State*, 667 N.E.2d 1113, 1114 (Ind. 1996) (finding defendant's reliance on Indiana Code section 35-34-1-5(e) was in error when the State was not seeking to add a habitual offender charge, but merely seeking to amend an existing charge). We, therefore, find Lacy's contentions in the present case that the State was required to show good cause to amend the already existing habitual offender charge to be misplaced.

[38]     Indiana Code section 35-34-1-5 governs amendments to criminal indictments or informations and permits amendments to both form and substance at any time prior to the commencement of trial as long as the defendant's substantial rights are not prejudiced by the amendment. Ind. Code § 35-34-1-5(a), (b). A

defendant's substantial rights include a right to sufficient notice and an opportunity to be heard regarding the charge. *Hurst v. State*, 890 N.E.2d 88, 95 (Ind. Ct. App. 2008), *trans. denied*. Our Supreme Court has stated that the question is ultimately whether the defendant had a reasonable opportunity to prepare for and defend against the charges. *Id*.

[39] Here, the State filed its notice of intent to file a habitual offender enhancement on October 23, 2013 at the same time it filed the initial charges against Lacy. Thereafter, on January 9, 2014, filed Count XIII, alleging Lacy to be a habitual offender. This charge alleged that Lacy had a 2005 conviction for nonsupport of a dependent under Cause Number 23C01-0502-FC-114 ("Cause 114"), a 2001 conviction for residential entry under Cause Number 79E02-0007-DF-340 ("Cause 340"), and convictions in 1992 for two counts of theft under Cause Number 23C01-9111-CF-388 ("Cause 388"). *Appellant's App*. at 50. The State moved to amend the habitual offender count on September 17, 2014 as to the conviction in Cause 114 by changing the dates of the offense and as to Cause 388 by removing the allegation of theft convictions. *Id*. at 67. The trial court granted this motion. On October 6, 2014, the day before the trial began, the State moved to amend the habitual offender count with respect to Cause 388 in order to restore the previously-removed theft convictions.

[40] Based on these facts, Lacy was aware that the State intended to seek a habitual offender finding against him as of October 23, 2013. He was on notice that the State intended to prove this status by his prior convictions under Cause 114, Cause 340, and Cause 388 from the date of the filing of the habitual offender

charge on January 9, 2014 until the State's first amendment on September 17, 2014. During this period of time, the case was set for trial five times, as the trial court noted during a hearing on the State's motion to amend. Then, for a short period of time from September 17 until October 7, 2014, when the trial court granted the second amendment, the State removed Cause 388 from the allegations until its motion to reinstate the identical habitual offender information that had been alleged for over eight months prior to the amendment on September 17. At the time the trial court granted the State's motion to amend the habitual offender charge, Lacy did not raise any complaints regarding a scramble to review additional documentation or allege prejudice resulting from a decision as to whether he should testify. We conclude that Lacy had a reasonable opportunity to prepare for and defend against the habitual offender charge, and the trial court did not abuse its discretion in allowing the State to amend the habitual offender charge.

[41] Affirmed in part and reversed in part.

Najam, J., and Barnes, J., concur.